**EASTERN ILLINOIS TRUST & SAVINGS BANK, a State Bank Chartered Under the Laws of the State of Illinois, Plaintiff,**

v.

**James C. SANDERS, Administrator of the Small Business Administration, et al., Defendants.**

**No. 84 C 4579.**

United States District Court, N.D. Illinois, E.D.

April 2, 1986.

Jeffrey D. Colman and Norman M. Hirsch, Jenner & Block, Chicago, Ill., for plaintiff.

Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., for defendants.

### MEMORANDUM AND ORDER

MORAN, District Judge.

### BACKGROUND

On May 30, 1984, Eastern Illinois Trust & Savings Bank of Momence, Illinois ("Eastern") filed a complaint against the

Small Business Administration ("SBA") and its administrator, James C. Sanders, seeking damages for the SBA's refusal to honor its contractual obligation to purchase a 90 per cent share of three SBA-guaranteed loans which had gone into default. On August 8, 1984, the SBA filed its answer, contending that Eastern's violations of the lender compensation provisions of the guaranty agreement released the SBA from its obligation to purchase the loans, and that those violations also entitled the SBA to recover monies the SBA paid out in honoring its guaranty on a fourth loan. Both parties filed motions for summary judgment, which were denied. No. 84 C 4579, slip op. (N.D.Ill. Dec. 24, 1985). The case was tried by this court from October 2 to October 5, 1985. At the close of evidence this court made oral preliminary findings of fact and ordered further briefing as to the applicable legal standard in this case. For the following reasons we now find that Eastern's breach of the guaranty agreement was not material and order the SBA to honor its guaranties of the Reeves, G & W and Larson loans. The SBA will not recover funds already expended to guarantee the Mackin loan.

## FACTS

On November 16, 1978, Eastern entered into a blanket guaranty agreement ("agreement") with the SBA which applied to subsequent loans authorized by the SBA and made by Eastern to aid small businesses. Paragraph 7 of the agreement was entitled "Purchase by SBA," and provided in part as follows:

> Lender may demand in writing that SBA purchase the guaranteed percentage of the outstanding balance of the loan if default by a borrower continues uncured for more than 60 days (or less, if SBA agrees) in making payment, when due, of any installment of principal or interest on any note.

Paragraph 8 of the agreement was entitled "Fees or Commissions," and read in its entirety:

> Lender shall not require certificates of deposit or compensating balances and shall not directly or indirectly charge or receive any bonus, fee, commission or other payment or benefit in connection with making or servicing any loan, except reimbursement for charges or expenses incurred or compensation for actual services rendered.

Certain other paragraphs of the agreement provided that violation of the conditions laid forth in that paragraph would result in an SBA denial of liability on the loan. Paragraph 8 contained no such provision, however.

### The Reeves Loan

On November 7, 1979, the SBA issued an authorization and loan agreement approving a request that the SBA guarantee 90 per cent of a $250,000 loan to be made by Eastern to Reeves Communications, Inc. ("Reeves"). Pursuant to that authorization, Reeves signed a $250,000 note with a seven-year term on November 20, 1979. Eastern subsequently disbursed $249,128.82 of the principal of the loan: $1,000 for loan expenses disclosed to the SBA and the balance to Reeves. At the time that the SBA-guaranteed loan was being negotiated, Eastern also made a secondary loan of $15,000 to Reeves. This secondary loan was not disclosed to the SBA.

Reeves made only two payments on the loans after October 1979, and on June 2, 1981 Eastern demanded in writing that the SBA purchase the guaranteed portion of the primary loan, as the loan was more than 60 days overdue. Reeves ceased to be an operating business in or about October 1981.

### The Mackin Loan

On January 28, 1980, the SBA issued an authorization and loan agreement approving a request that the SBA guarantee 90 per cent of a $375,000 loan by Eastern to Mackin Corporation ("Mackin"). Pursuant to that SBA authorization, Mackin signed a $375,000 note with a 15-year term on February 26, 1980. Subsequently, Eastern disbursed the entire amount of the loan to Mackin, less only certain expenses associated with the loan which were disclosed to the SBA. On February 26, 1980, Eastern

also made a secondary loan to Mackin of $20,375. The secondary loan was not disclosed to the SBA.

In July 1981 Eastern demanded in writing that the SBA purchase the guaranteed portion of the primary loan, which had since gone into default. The SBA purchased its portion of that loan on September 8, 1981. Mackin Corporation was an operating business until August 1984.

### The G & W Loan

On October 14, 1980, the SBA issued an authorization and loan agreement approving a request by Eastern that the SBA guarantee 90 per cent of a $275,000 loan by Eastern to George Grevenstuk and James West, doing business as G & W Fertilizer Company ("G & W"). Pursuant to that SBA authorization, Grevenstuk and West signed a $275,000 note with a seven and one-half year term on November 3, 1980. Eastern subsequently disbursed the entire principal of the loan, less only certain expenses which were disclosed to the SBA. On November 4, 1980, Eastern made a secondary loan of $19,250 to G & W. This loan was not disclosed to the SBA.

On January 14, 1982, Eastern demanded in writing that the SBA purchase the guaranteed portion of the primary loan, which was more than sixty days overdue. G & W was still an operating business as of January 1982.

### The Larson Loan

On December 12, 1980, the SBA issued an authorization and loan agreement approving a request that the SBA guarantee 90 per cent of a $490,000 loan by Eastern to Larson Tire Centers, Inc. ("Larson"). Pursuant to that authorization, Larson signed a $490,000 note with a fifteen and-a-half-year term on December 24, 1980. Eastern subsequently disbursed the entire amount of the principal, less certain immediate loan expenses which were disclosed to the SBA. On December 26, 1980 Eastern made a secondary loan to Larson of $20,000. This loan was not disclosed to the SBA.

On January 5, 1982, Eastern demanded in writing that the SBA purchase the guaranteed portion of the primary loan, which was more than sixty days overdue. Larson remained an operating business until November 29, 1983.

On January 27, 1982, Eastern received a letter from James Burke, an SBA officer, which stated that the SBA had ordered a check from the Treasury for the guaranteed portion of the Larson loan to be paid to Eastern. On March 2, 1982, Eastern received a letter from John L. Smith, district director of the SBA, which stated that the SBA would not honor any of the loan guaranties it had made to Eastern until a Department of Justice investigation of the secondary loans made to Reeves, G & W and Larson had been completed.

### DISCUSSION

It is undisputed that the side loans charged to the borrowers by Eastern violated the agreement between the SBA and Eastern, in effect allowing Eastern to charge the borrowers a higher interest rate than the guaranty agreement permitted. The question, however, is whether the breach was so material as to release the SBA from the obligation to honor its guaranties and so material as to require that Eastern disgorge the guaranty funds it has already received for the Mackin loan. This issue was raised by the parties in their motions for summary judgment and addressed by testimony at trial. At the close of testimony, however, this court remained troubled by the unusual context of this case and the impact that context should have upon this court's materiality analysis. A contractual relation between a federal governmental agency such as the SBA and a private party is qualitatively different from a contractual relation between two private parties. Materiality of breach between private parties basically involves questions of causation and damage. Materiality of breach with regard to a federal agency raises the issue of how the courts are to deal with breaches of trust which have the potential to impact negatively on the overall success of important governmental programs, such as the guaranteed loan program. A single breach of trust

may have little or no financial impact on the SBA but so undercut the regulatory objectives of a program that the damage caused by the breach is far out of proportion to the damage generally contemplated as the potential risk of a single financial transaction. In the materiality analysis applicable to this case, therefore, the concept of non-financial harm to the SBA must play a role.

The determination of materiality of breach as between the SBA and a private party is governed by resort to contract principles of general federal law. *See First National Bank, Henrietta v. Small Business Administration*, 429 F.2d 280 (5th Cir.1970). As we noted earlier in this case, only a material breach of the contract by one party will justify non-performance by the other. Restatement, 2d of Contracts § 229. Threshold factors to be considered in determining whether a breach is material include: (1) whether the breach operated to defeat the bargained-for objective of the parties; (2) whether the breach caused disproportionate prejudice to the non-breaching party; (3) whether custom and usage considers such a breach to be material; and (4) whether the allowance of reciprocal non-performance will result in the accrual of an unreasonable and unfair advantage. *Sahadi v. Continental Illinois National Bank & Trust Company*, 706 F.2d 193 (7th Cir.1983). In this case, as noted above, the degree of Eastern's breach of trust also enters the calculus as we consider the materiality of Eastern's breach of contract.

We apply each of the *Sahadi* criteria in turn. Initially, we find that the side loans charged to the borrowers by Eastern did not operate to defeat the bargained-for objective of the parties, namely provision of capital to small businesses on reasonable terms, with regard to the four loans at issue here. The side loans did not diminish the initial flow of funds to the borrower. Neither did they negatively impact on the borrower's ability to repay the loan.

Second, Eastern's breach did not cause disproportionate financial prejudice, or indeed any financial prejudice, to the SBA.

This court has already found that the side loans did not affect the borrowers' ability to repay the primary loans. In addition, Eastern's collateral position on the secondary loans was in all cases subordinate to the position of the SBA and Eastern on the primary loan. The secondary loans only increased Eastern's exposure to the borrowers. The fact that fees were charged to the borrowers does not of itself constitute prejudice to the SBA where, as here, Eastern's non-disclosure had no effect on the SBA's risk. *Everman National Bank v. United States*, 756 F.2d 865 (Fed.Cir. 1985), on which the SBA relies to establish that misrepresentations in a loan application will lead to loan denial on default, is not apposite here. *Everman* concerned the application of a dairyman whose milk had been downgraded from grade A to grade B (unfit for human consumption). No similar fact indicating an enhanced risk of default by a borrower was present in any of these cases. We have already found that Eastern made these loans in good faith, believing that they would be repaid.

The SBA's position, however, is that considerable prejudice to the guaranteed loan program resulted from Eastern's actions even if that prejudice cannot be characterized as financial, since other lenders might learn of Eastern's violations and emulate them. A breach of trust such as Eastern's here is indeed a serious violation of the guaranty agreement from the SBA's point of view and one with which it has good reason to be concerned. At trial, the general counsel for the SBA, however, specifically stated that the SBA does not deny loan guarantees as an example to other lenders. In addition, the SBA standard operating procedure ("SOP") 50–50–3 ¶ 56, which sets out standards for SBA determinations as to whether or not to deny a loan guaranty, specifically contains two prerequisites for loan denial. The first is a substantial failure of compliance by the lender; the second is a substantial loss on the loan which results from the lender's substantial failure of compliance. This is the SBA's only SOP regarding denial of loan guaranties.

These facts, while certainly not binding or determinative, provide strong evidence of SBA practice. At trial, this court listened to much testimony regarding the SBA's historical responses to various breaches of the guaranty agreement. What was clear from that testimony was that in no situation in which the SBA suffered no monetary losses as a result of a lender's violation, nor in which the offending bank was willing to erase the complained-of transaction[1] were the sanctions imposed by the SBA on the bank as severe as those imposed on Eastern here.

The government attempts to distinguish its past practice from the instant case by claiming that Eastern's case is qualitatively different from other guaranty agreement violation cases because Donald Starks, Eastern's then vice-president and the man who negotiated these loans, pleaded guilty to a one-count misdemeanor of receiving a fee in connection with an SBA loan. This court continues to find that argument unpersuasive. That conviction is a fact, but loan denial or honor should not depend on whether or not the federal government chooses to prosecute a misdemeanor. In other cases of guaranty agreement violations such as the CALBIDCO and Palm Beach scenarios discussed at length at trial, the SBA was certainly equally convinced that a breach of trust had occurred. The SBA did not deny liability on those loans however.

This is not to say that the secondary loans were proper or that Eastern was justified in making them. The loans clearly violated the guaranty agreement, despite Eastern's supposed reliance on the advice of counsel, and the SBA has the right to take certain actions to redress that breach. The SBA could certainly require that the secondary loan transactions be rescinded, for example, as indeed it has in other cases dealing with similar violations. The SBA could also bar Eastern from further participation in the guaranteed loan program, as it may have done here. Total denial of the loan, however, is a far more extreme re-

sponse and one that we find unwarranted in these circumstances. If the SBA wishes loan denial to be among its avenues of recourse in cases where banks impose unlawful fees on borrowers, it should specifically note the possibility of denial in paragraph 8 of the guaranty agreement, the section which governs the fees a bank can charge. The SBA does specifically note the possibility of denial in other paragraphs of the guaranty agreement, including paragraph 4 (reporting requirements) and paragraph 5 (fees required to be paid to the SBA).

The SBA may not, however, simply change the guaranty agreement provisions regarding loan denial after the fact. The risk of loan denial if improper fees were charged was clearly not within the contemplation of the parties at the time this agreement was entered into, and we decline to allow the SBA to make an example of Eastern where the bank had no notice of the risk it ran. To allow the SBA to deny liability on these loans at this point would "result in [the] accrual of an unreasonable or unfair advantage" to the SBA, 706 F.2d at 196, since the SBA would thereby be able to avoid a debt that it would have incurred regardless of the existence of any secondary loans, given the effect which the 1981 recession had on the Momence, Illinois economic community.

If this were a case in which public monies had been fraudulently obtained by the bank from the government, as was alleged in *Miller v. United States*, 213 Ct.Cl. 59, 550 F.2d 17 (1977) (receipts submitted to government for reimbursement where work not actually done), our analysis might well be different. Here, however, such was simply not the case. In effect, the government here seeks imposition of the types of penalties applicable to violations of the False Claims Act, 31 U.S.C. § 3729, or the Forfeiture Act, 28 U.S.C. § 2514. Those penalties are inappropriate in these circumstances. Indeed, even where violations of the False Claims Act have been

---

**1.** Eastern reversed the secondary loans in February 1982, as soon as the SBA communicated its displeasure with the loans to the bank, and well before at least two of the borrowers had failed.

**1398**

proven, courts have refused to allow the government to cancel its liability where it was not harmed as a result of the false claim. *See United States v. Woodbury,* 359 F.2d 370 (9th Cir.1966) (contractor failed to disclose liens in connection with government guaranteed housing project); *United States v. Hibbs,* 568 F.2d 347 (3d Cir.1977) (broker's false certification of heating and plumbing not related to mortgagor's default). Where, as here, "precisely the same loss would have been suffered by the government had the certification been accurate and truthful," 568 F.2d at 351, the government is not entitled to renege on its obligations. The SBA's claim that "but for" the misrepresentation it would not have guaranteed these loans is unconvincing. An immaterial misrepresentation is not of itself sufficient to void the guaranty agreement. *See Brunswick Bank & Trust Co. v. United States,* 707 F.2d 1355 (Fed.Cir.1983).

### CONCLUSION

While Eastern's breaches of the guaranty agreement were deplorable, they were not so material as to justify voiding the agreement. The SBA is ordered to honor its guaranties on the Reeves, G & W and Larson loans; amounts already paid to Eastern to guarantee the SBA's portion of the Mackin loan will remain with Eastern.