UNITED STATES of America, Plaintiff,

v.

FIRST NATIONAL BANK OF
CICERO, Defendant.

No. 87 C 3464.

United States District Court,
N.D. Illinois, E.D.

April 30, 1990.

Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Richard W. Burke and Stephen C. Voris, Burke, Wilson & McIlvaine, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

In this action the United States seeks to recover approximately $411,000 it paid to the defendant bank pursuant to a loan guaranty, along with other damages. The government bases its claim for recovery on several grounds; it contends that the bank improperly applied the loan proceeds in violation of various agreements between the parties, that it made material misrepresentations which the government relied upon, and that it submitted a false claim for payment in violation of the False Claims Act, 31 U.S.C. §§ 3729–3731. Before the court are the parties' cross-motions for summary judgment. For the following reasons, the government's motion for summary judgment is denied, and the Bank's motion for summary judgment is granted.

## I. BACKGROUND

This case centers on a loan made to the Holiday Oldsmobile car dealership ("Holiday") by defendant, the First National Bank of Cicero ("Bank"). The loan was guaranteed by the Small Business Administration ("SBA"), as part of the Automobile Dealers Loan Guarantee Plan ("Plan"), which was created by the Carter Administration on July 8, 1980. Appendix 11 to Defendant's Motion for Summary Judgment ("App. 11"). The purpose of the Plan was to provide financial assistance to the nation's auto dealers, who were at the time suffering the effects of the country's economic downturn. *Id.*

Before the loan in question here, the Bank had previously dealt with Holiday and its owner, Leslie Cohodes. On February 29, 1980, the Bank made two loans to Holiday totaling $165,000. App. 13. The loans were secured by a bank certificate of deposit in the amount of $100,000 which Cohodes purchased with the loan proceeds, and by some stock and vehicle titles. App. 14, 15. In May of 1980, the Bank renewed and increased a $14,000 loan by $10,000, accepting a $10,000 certificate of deposit as collateral. App. 15A.

In June or July of 1980, the Bank's President, Joseph Schuessler, informed Cohodes that the Bank would be willing to loan Holiday an additional $75,000 to $100,000 for working capital under the Loan Guarantee Plan. Deposition of Joseph Schues-

sler ("Schuessler Dep.")[1] at 40. Schuessler suggested that Cohodes contact a business consultant named Gregory Xylas for assistance in preparing the SBA loan application package. Schuessler Dep. at 37–38. On July 24, 1980, the Bank entered into a Deferred Participation Loan Guaranty Agreement ("Guaranty Agreement" or "Agreement") with the SBA in anticipation of the Bank's participation in the Plan. App. 30. The Guaranty Agreement was expressly made subject to SBA Rules and Regulations. *Id.,* ¶ 1.

On September 11, 1980, Xylas delivered a completed SBA loan application package to the Bank, where it was handled by a bank officer named William Giova. The package included not only the Borrower's (Holiday's) Application, but also a completed Lender's Application for the Bank to sign. App. 12A, B. The proposed loan was to be for $493,000. App. 12A. The Borrower's Application set out the proposed uses for the money: $60,000 for new equipment, $94,000 for working capital, $100,000 to pay existing accounts payable, $171,000 to pay off existing loans to the Bank, and $68,000 to purchase inventory. *Id.;* App. 12C at 287.

The SBA materials were prepared by Xylas, and except for the Lender's Application were signed by Xylas and Cohodes. App. 16B, request No. 19; App. 12A, B, C. The materials contained several deliberate misstatements. The Lender's Application was incorrect in several respects; for example, it falsely stated that Cohodes had been in the auto dealership business for 40 years, and showed the business operating at a profit when it was actually incurring losses. App. 12B; Deposition of Leslie Cohodes at 38–39. The remainder of the application contained several other inaccuracies; it misstated Holiday's net assets and gross sales, contained an incorrect corporate tax return, and listed as a credit reference a bank with which Holiday had never done business. App. 12C at 270–73, 293–299, 289; Cohodes Dep. at 40–42, 54–55, 47–48. Finally, the SBA package contained

an SBA Form 159 "Compensation Agreement," indicating that Cohodes paid Xylas $250 for completing the application. App. 12C at 316. In reality, Cohodes paid Xylas $3800 in cash and gave him a new Oldsmobile worth $12,200. Cohodes Dep. at 58; App. 6 at 12; App. 7.

Cohodes blames Xylas for preparing the false application, and admits that he did not remember seeing, or did not see, many of the pages of the application, including some which bore his signature. Cohodes Dep. at 37–38, 44. Cohodes was, however, convicted in March of 1986 of misrepresenting the amount of compensation paid to Xylas, in violation of 18 U.S.C. § 1001, App. 6, 7, and sentenced to nine months in prison. App. 8. Xylas was investigated by the SBA in connection with the SBA application, but died before an indictment could be obtained. App. 16A, Request No. 4. No one from the bank was indicted with Cohodes or named in the indictment as a co-conspirator. App. 6; App. 16B, Request No. 7.

When the SBA package was delivered to the Bank it was reviewed by Giova. Giova did not conduct an independent check of Holiday's application because the company was an existing customer and was not considered a problem customer. App. 12B; Deposition of William Giova at 86–87. In particular, neither Giova nor anyone else at the bank made a search of the public records to determine if there were any liens or encumbrances against Holiday or its assets. Exhibit 38 to Plaintiff's Motion for Summary Judgment ("Ex. 38"), Request No. 14. Giova reviewed and signed the Lender's Application that had been prepared by Xylas. App. 12B.

Holiday's application arrived at the SBA offices on September 12, 1980. App. 12A. The application initially went to the Chief of the SBA's Financing Division, William Brown, who assigned applications to individual loan specialists. Deposition of Irma Cerda at 14. In this case, the application

---

**1.** Relevant excerpts of all depositions referred to in this opinion are attached as exhibits to the

Bank's motion for summary judgment.

went to a loan specialist named Joseph Feldman, who was to review the application and recommend approval if he found it satisfactory. Deposition of Joseph Feldman at 4, 15–18. As part of its normal procedures, the SBA ordered a Dun & Bradstreet credit report on Holiday when the application first came into the SBA offices. Cerda Dep. at 18, 20, 21; App. 16A, Request No. 9; App. 18.

The SBA does not admit that it ever received the D & B report.[2] It is undisputed, however, that the report contains extremely negative information about Holiday, including the existence of IRS liens, Illinois Department of Revenue liens, and court judgments. App. 20; App. 16A, Request No. 12. Both Feldman and Brown stated that the loan would not have been approved if they had seen the D & B report. App. 21; Deposition of William Brown at 42. Feldman recommended approval of the Holiday application on October 2, 1980. Feldman Dep. at 38–40, App. 23. Brown then reviewed the application and Feldman's report and approved the loan on October 10, 1980. App. 23–24; Brown Dep. at 32–33.

After Brown's approval, the SBA sent an "Authorization and Loan Agreement" ("Authorization") to the Bank to advise the Bank of its decision. App. 24. Subject to certain conditions, the SBA was agreeing to guarantee 90% of a $493,000 loan made by the Bank to Holiday. *Id.* The Authorization was expressly made subject to the Guaranty Agreement signed by the Bank on July 24, 1980. App. 24, ¶ 2(a). Paragraph 3 of the Authorization set out the "Terms of Loan," and stated that the loan was authorized for the same "use of proceeds" which was listed in the Borrower's Application"; only $171,000 was to be used to pay off debts owed to the Bank. *Id.*, ¶ 3(b)(4).

The loan was closed on October 27, 1980, at the Bank. The Bank immediately debited $171,000 from the $493,000 proceeds to pay off the February 1980 loans listed in the application and Authorization. App. 25. The remaining $322,000 was deposited in Holiday's checking account. *Id.* On October 28, 1980, Patricia Putney, Holiday's secretary, wrote two checks to the Bank in the amounts of $46,475 and $40,025. App. 26. These checks were written to pay off interim financing and a used car floor plan loan. *Id.* The interim financing totalled $32,500: an August 28, 1980 $7500 loan, and a $25,000 loan which was made on October 6, 1980, after approval of the SBA loan but before its disbursal. App. 33.

Schuessler stopped by the closing and was shocked to learn that the Holiday loan was for $493,000 rather than $75,000 to $100,000. Cohodes Dep. at 68. On learning the actual amount of the loan, Schuessler refused to release a $100,000 certificate of deposit which Cohodes had previously pledged to the Bank, though the CD had originally been pledged as collateral for the February 1980 loan of $165,000, and not for the $493,000 loan. Cohodes Dep. at 70; Schuessler Dep. at 43. Schuessler did release the other collateral from the February, 1980 loan, including the stock and car titles. App. 27. The Bank did not assign the CD to the SBA. Also on the closing date, the Bank signed a "Settlement Sheet" documenting the loan disbursement. Ex. 42. By signing the Settlement Sheet, the Bank certified that the loan proceeds were used in accordance with the Authorization. *Id.*

From November of 1980 to March of 1981, Cohodes and Holiday made interest payments to the Bank according to the terms of the SBA loan. On March 8, 1981, however, Holiday Olds was destroyed by fire, and Holiday subsequently defaulted

---

**2.** In its motion for summary judgment, the Bank refers to the affidavit of Pasquale E. Moccio, of Dun & Bradstreet, to demonstrate that the D & B report was actually sent out by D & B on September 20, 1980. The government has moved to strike Moccio's affidavit. While, as noted below, we deny this motion, we also point out that the denial of this motion has little practical effect. The SBA's procedures in reviewing the application are not an essential factor affecting our decision, and whether the SBA actually received the D & B report has no bearing whatsoever on our decision.

on the loan. On April 10, 1981, the Bank sent a letter to the SBA asking that it honor the guaranty. Around this same time the Bank notified the SBA that it was holding some CDs, and that $50,000 or more was available to reduce to outstanding balance on the loan. The SBA told the Bank to apply the $50,000 to reduce the balance, and the Bank did so. App. 28, 29. The SBA honored its 90% guaranty on June 28, 1981 by issuing a check to the Bank in the amount of $410,710.29 (hereinafter rounded to $411,000). App. 34. The SBA expressly noted, however, that it was making payment in reliance upon the Bank's representations that the loan had been "closed and serviced in accordance with the terms and conditions of [the] Authorizations and Loan Guaranty Agreement." Ex. 45.

On April 14, 1987, the SBA filed this action seeking, *inter alia,* recovery of the $411,000 paid under the guaranty. While the SBA makes somewhat different prayers for relief in each of the three counts, essentially each count sets forth a different theory justifying recovery of the $411,000. In Count I, the SBA alleges that the Bank materially breached the terms of the Agreement and Authorization. Count II charges the Bank with misrepresenting several facts on its Lender's Application and in its written demand for payment under the guaranty, despite the fact that it knew or should have known of the inaccuracy of the statements. In Count III the SBA alleges that the Bank violated the False Claims Act, 31 U.S.C. § 3729–31, by making misrepresentations in its Lender's Application and in the Settlement sheet, and by making the demand on the SBA to honor its guaranty. Count IV states a claim against Cohodes under the False Claims Act, but Cohodes has chosen not to defend this action.

Both sides have moved for summary judgment. In its motion, the Bank contends that it did not breach any terms of the agreement between itself and the SBA, and, more vigorously, that any breach of the parties' agreement was not material, and thus does not justify rescission of the guaranty. The Bank also asserts that

Count II is barred by the three-year statute of limitations, contained in 28 U.S.C. § 2415(b), for tort claims asserted by the United States. As to Count III, the Bank contends that the SBA has failed to demonstrate that the SBA's loss is causally related to the alleged false claim, and that Count III is barred by the six-year statute of limitations contained in the False Claims Act, 31 U.S.C. § 3731(b).

In its motion for summary judgment, the SBA argues that the Bank did breach the agreement between itself and the SBA, and that this breach was material and directly caused the SBA's loss. The SBA also argues that Count II is not subject to the three-year statute of limitations for tort claims, but rather is subject to the six-year statute of limitations for contract claims. With respect to Count III, the SBA contends that there should not be a causation requirement under the False Claims Act, that in any event its losses were caused by the SBA's misrepresentations, and that Count III is not barred by the False Claims Act's six-year statute of limitations. We find that the Bank did breach the agreement between itself and the SBA, but that this breach was not material and does not justify rescission of the guaranty. We also find that Count II is barred by the three-year statute of limitations for tort claims asserted by the United States, and that the SBA has no claim under the False Claims Act because its loss was not sufficiently related to the Bank's false claim. We do not reach the question of whether Count III would be barred by the statute of limitations.

Besides the motions for summary judgment, also before the court is the SBA's motion to strike an exhibit to the Bank's motion for summary judgment, namely the Affidavit of Pasquale E. Moccio, which is attached as Appendix 22 to the Bank's motion for summary judgment. We deny this motion, though we note that this denial has no practical effect on the main issues in this case. As the following discussion will make clear, the facts sought to be demonstrated in this affidavit have no bearing on our decision.

## II. ANALYSIS

### A. Materiality of the Bank's Breach of the Agreement

#### 1. *Existence of a Breach*

■ Count I of the complaint is essentially a breach of contract claim. The Bank first contends that it is entitled to summary judgment on Count I because it did not breach any agreement with the SBA. The Bank did, however, breach the agreement between itself and the SBA, primarily by accepting $86,000 of the loan proceeds to pay off prior bank loans. What we will refer to as the "agreement" between the parties actually consists of several separate documents produced during the course of their relationship.

The document which instituted the contractual relationship between the parties was the Guaranty Agreement, which was signed on July 24, 1980. The relevant portion of the Agreement for our purposes is Paragraph 3, which provides in part that the Bank "shall close and disburse each loan in accordance with the terms and conditions of the approved loan authorization." App. 30, ¶ 3. The inclusion of this provision meant that, when the Authorization was later prepared, it became part of the agreement between the Bank and the SBA even though the Bank did not sign the Authorization, at least insofar as the Authorization set out requirements for "use of proceeds." The Bank was bound to disburse the loan in accordance with the "use of proceeds" provision in the Authorization, which only allowed $171,000 to be used to pay off debts to the Bank. App. 24, ¶ 3(b)(4). In addition, the Settlement Sheet which was signed by the Bank on October 27, 1980 also become part of the parties' agreement. In the Settlement Sheet, the bank certified that the loan proceeds were used in accordance with the provisions of the Authorization. Ex. 42. Finally, the bank added another promise to its agreement with the SBA when it requested payment on the guaranty. Under the Agreement, by requesting payment the bank was certifying that the loan had been "disbursed and serviced in compliance with" the Guaranty Agreement. App. 30, ¶ 7.

The Bank breached the agreement between itself and the SBA by allowing approximately $86,000 of the loan proceeds to be used to pay off prior loans to itself. Under the Guaranty Agreement, the Bank was required to close and disburse the loan in accordance with the Authorization, and the Authorization marked only $171,000 of the proceeds for repayment of loans from the bank; instead, the bank accepted approximately $257,000. The Bank argues that it did not breach the agreement because it merely released the remaining funds, beyond the $171,000, to Holiday, and Holiday happened to use part of these funds the next day to pay off other loans from the Bank. There is no dispute that the Bank would have breached the agreement between the parties by directly debiting the additional $86,000 towards the prior loans on the date of disbursement. Similarly, by knowingly accepting an unauthorized use of the loaned funds on the very next day for its own benefit, it can be said that the Bank disbursed the funds in contravention of the Guaranty Agreement and Authorization.

■ In addition, if the bank did not breach the agreement with the SBA when it accepted the $86,000, it certainly did so with subsequent false statements to the SBA. The Bank may not have technically made a misrepresentation when it signed the Settlement Sheet, thereby certifying that the loan proceeds "were used" in accordance with the authorization. The Settlement Sheet was signed on October 27, 1980, and the funds were not disbursed until the next day. Nonetheless, at some point after October 28 the Bank breached the agreement by failing to correct this misstatement. In any event, the Bank made a misstatement by making a demand for payment on the guaranty. By so doing, the Bank certified that the loan had been disbursed and serviced in accordance with the Guaranty Agreement, because at this point the loan had not been properly disbursed. The Bank has breached its agreement with the SBA by accepting the extra

$86,000, and with these later false statements. As these breaches are all related, we will refer to them as a single breach.

■ We found no breaches of the agreement on the Bank's part other than that just discussed. The SBA contends that the Bank also breached the agreement by failing to search the public records to determine the existence of any liens on the collateral for the loan. We find two reasons that the Bank did not have such an obligation. First of all, while we previously found that the Bank was bound by the "use of proceeds" set out in the Authorization, this was because this portion of the Authorization was specifically incorporated into the Guaranty Agreement. The main purpose of the Authorization, however, was to impose conditions on the borrower, and the Bank is not even a signatory to the Authorization. We are not convinced that the Authorization by itself could impose any obligations on the Bank.

Secondly, and more importantly, we find that the Bank had no obligation to search the public record for liens because the language of the Authorization does not support such a requirement. The Authorization merely lists the collateral required for the SBA's approval; it says nothing about who bears the responsibility for ensuring its adequacy. App. 24, ¶ 3(c). It would be mere speculation to interpret the listing of collateral in the loan Authorization as meaning that the Bank had an obligation to search the public record to make sure that no prior liens existed on the property.

■ Finally, the SBA argues that the Bank breached the agreement between the parties by failing to administer the loan in accordance with reasonable and prudential commercial standards. The SBA relies upon *Citizens Marine National Bank v. United States Department of Commerce,* 854 F.2d 223 (7th Cir.1988), in which the Seventh Circuit held that the United States Economic Development Administration ("EDA") was not liable on a guaranty where the bank had engaged in several imprudent lending practices. *Id.* at 228–29. In that case the guaranty agreement between the parties required the bank to exercise "such care and diligence in the disbursement, servicing, collection and liquidation of the Loan as would be exercised by a reasonable and prudent commercial bank in dealing with a loan of its funds without guaranty." *Id.* at 225. The court found that the bank materially breached this agreement by ignoring a devastating financial statement of the borrower just weeks before the closing, and with several other acts which occurred after the closing. *Id.* at 227–228. After the closing, the bank allowed the borrower to purchase fixed assets without the bank's permission; even after default, the bank continued advancing the borrower money, and allowed the borrower to issue overdrafts and to repay them out of its accounts receivables. *Id.* at 228.

The SBA argued that the Bank similarly breached the agreement in this case by loaning Holiday money without checking into its precarious financial situation. We find no such breach. The Agreement in this case required the Bank, in the closing and disbursement of the loan, to take any actions which "shall, consistent with prudent closing practices, be required in order fully to protect or preserve the interests of [the Bank] and [the] SBA in the loan." App. 24, ¶ 3. The Agreement sets out standards to be followed in closing and disbursing the loan. By arguing that the Bank failed to examine Holiday's financial situation more carefully, the SBA is discussing conduct which occurred, or should have occurred, before closing of the loan, i.e., in the *making* of the loan. The Agreement does not cover the Bank's conduct in originally approving the loan, and such conduct could not breach the Bank's duty to prudently close and disburse the loan. *See Id.* at 228. In addition, any acts of imprudence on the Bank's part after or at the time of the closing could not have risen to the level of the grossly negligent acts of the bank in *Citizens Marine. Id.*

### 2. Materiality of the Breach

■ Having found one breach of the agreement between the parties, we next consider whether this breach was material.

If it was not, the SBA should not be allowed to recover on its breach of contract claim, because only a material breach of contract by one party will justify non-performance by the other. *Eastern Illinois Trust & Savings Bank v. Sanders*, 631 F.Supp. 1393, 1396 (N.D.Ill.1986) (citing Restatement 2d of Contracts, § 229), *aff'd*, 826 F.2d 615 (7th Cir.1987). In determining the materiality of the Bank's breach, we will use the four-part analysis derived by Judge Morgan from *Sahadi v. Continental Illinois National Bank & Trust Co.*, 706 F.2d 193 (7th Cir.1983), applied in *Eastern*, and affirmed by the Seventh Circuit. *Eastern Illinois Trust & Savings Bank v. Sanders*, 826 F.2d 615 (7th Cir. 1987). The SBA relies more heavily on *First Interstate Bank v. Small Business Administration*, 868 F.2d 340 (9th Cir. 1989), which used a somewhat different test for judging materiality, *id.* at 344, and we will also refer to this test. In *First Interstate*, the Ninth Circuit found that a breach was material under its own test or under the *Eastern* test. *Id.* at 344–46. Nonetheless, the opinions are not completely consistent, and to the extent that they are inconsistent we will of course follow *Eastern*.

In *Eastern*, Judge Moran set out four factors to be considers in determining whether a breach is material:

1) Whether the breach operated to defeat the bargained-for-objective of the parties; 2) whether the breach caused disproportionate prejudice to the non-breaching party; 3) whether custom and usage considers such a breach to be material; and 4) whether the allowance of reciprocal nonperformance will result in the accrual of an unreasonable and unfair advantage.

631 F.Supp. at 1396 (citation omitted). The first factor in this analysis favors the Bank, as we find that the breach did not significantly defeat the bargained-for objective of the parties. The bargained-for objective of the parties was to arrange a guaranteed loan which would enable Holiday to get back on its feet. This objective was not defeated by the Bank's being paid $86,000 over and above the amount authorized for loan repayment. Certainly the bargained-for objective would have been defeated if Holiday used so much of the proceeds to pay off old bank loans that this repayment significantly affected its ability to repay the $493,000 loan, but this was not the case. *Eastern* also involved SBA-guaranteed loans; in that case, the Bank breached its agreements with the SBA by making unauthorized side loans to the businesses who were recipients of the SBA-guaranteed loans. 631 F.Supp. at 1394–95. In finding that the side loans did not breach the bargained-for objective of the parties, Judge Moran noted that the loans did not decrease the initial flow of funds to the buyer or negatively affect the borrowers' abilities to repay their loans. *Id.* at 1396.

In this case, the Bank's breach had more of an effect on the borrower's ability to repay the loans in question, but this effect was not major. The Bank's acceptance of $86,000 obviously did mean that the dealership had $86,000 less cash with which to pay off the guaranteed loan. About $32,000 of this $86,000, however, was used to pay off short-term loans. The Bank had loaned the dealership $7500 in August, and $25,000 in October, this latter loan being made after the primary loan was approved but before it was disbursed. Repayment of these loans, particularly the second one, had little effect on Holiday's financial position, because these funds had been used in the previous three months to finance the dealership's operations; the $25,000, in fact, seems to have been essentially an advance of a portion of the $493,000 loan. The remainder of the unauthorized amount, approximately $53,500, was used to pay off used car floor plan loans. These loans are routine in the auto industry and are repaid in the ordinary course of an auto dealer's business. While repayment of this $53,500, at least, had some effect on Holiday's ability to repay the guaranteed loan, we find that this effect was not significant, given the percentage of this amount to the total loan amount. In addition, repayment of this $53,500 did little to defeat the bargained-for objective of the parties because,

by paying off the loan, Holiday was carrying on its dealership business.

The second *Eastern* factor is whether the breach caused disproportionate prejudice to the non-breaching party. As we have noted, the Bank's breach had no significant effect on the dealership's ability to repay the loan. While the SBA suffered substantial prejudice in this case, this prejudice was not caused by the Bank. Rather, it was caused by the fire and by Holiday's subsequent default, both of which were unrelated to the Bank's acceptance of the $86,000. The dealership, in fact, was making payments on the loan up until the time of the fire.

The SBA argues that we should give significant weight to the prejudicial effect of the Bank's breach on the SBA's policy against allowing banks to apply large percentages of guaranteed loan proceeds to pay off prior loans. The *First Interstate* court gave this prejudicial effect on SBA policy significant weight. 868 F.2d at 345. While we recognize the prejudicial effect of the Bank's breach on SBA policy, we find that it does not justify releasing the SBA from its guaranty obligation where the financial prejudice to the SBA was caused by the fire and by Holiday's default, and not by the Bank's action. While the SBA relies on *First Interstate*, it is apparent that the Ninth Circuit gave greater weight to the prejudicial effect on SBA policy than did the Seventh Circuit. *Cf. First Interstate,* 868 F.2d at 345, with *Eastern,* 826 F.2d at 619. In addition, the prejudicial effect on SBA policy was greater in *First Interstate* than it is here. In *First Interstate* the SBA authorized only $39,000 of a $320,000 loan for repayment of prior debt; the Bank instead applied $154,000 to repay prior loans. 868 F.2d 342. In this case $171,000 of a $493,000 loan was authorized to repay prior debt; the Bank instead applied an extra $86,000 to repay prior loans.

The third factor to consider is whether custom and usage considers a breach to be material. This factor does not favor either party, because neither party has presented any relevant evidence concerning custom in the industry or prior relations between the parties.

The last factor to consider is whether allowing the SBA to escape its obligations under the guaranty would result in the accrual of an unreasonable and unfair advantage to the SBA. We find that it would. The *Eastern* court found that denial of the guaranty would result in the accrual of an unfair advantage to the SBA because the risk of loan denial was not contemplated by the parties there as a consequence of the bank's breach. 631 F.Supp. at 1397. In addition, the court noted that by escaping liability on the guaranties, the SBA would be able to avoid a debt which it would have incurred regardless of the Bank's breach. *Id.*

Both of the reasons relied upon by the *Eastern* court in finding an "unreasonable advantage" are also applicable here. The parties do not seem to have intended that the Bank's acceptance of additional money to pay off prior loans would result in denial of the guaranty. In fact, the Guaranty Agreement discusses the possibility of complete guaranty denial in Paragraph 4, which deals with reporting requirements, and Paragraph 5, which deals with payment of the guaranty fee. The risk of total denial, however, in not mentioned in Paragraph 3 of the Agreement, which contains the provision which was breached in this case. *See Eastern,* 631 F.Supp. at 1397. In addition, allowing the SBA to escape liability in this case would result in an unfair advantage because the SBA would be avoiding a debt which it would have incurred regardless of the Bank's conduct. *See Id.* The SBA's loss resulted from the dealership's fire, which led to its subsequent default.

This case also differs from *First Interstate* with respect to the accrual of an unfair advantage to the SBA. In finding no unfair advantage, the Ninth Circuit relied on the egregiousness of the bank's conduct there. 868 F.2d at 345. In that case, the bank had twice unsuccessfully tried to persuade the SBA to increase the portion of the loan proceeds which was authorized for repayment of prior debt.

*Id.* at 342. When this failed, the bank tried to secretly apply an extra $115,000 to repay prior debt. *Id.* In this case, it is not even clear that the Bank intentionally breached the Agreement, and, even if it did, its conduct does not approach the conduct of the bank in *First Interstate* in terms of culpability.

Beyond the similarities between this case and *Eastern,* and the differences between it and *First Interstate,* we find another reason that allowing the SBA to escape its liability in this case would give it an "unreasonable and unfair advantage"—the SBA's loss was in large part due to its own negligence. The SBA entered into a contract whereby it agreed to guarantee 90% of the loan to Holiday, but took no steps to protect the funds it put at risk. We found above that the agreement did not impose an obligation on the Bank to determine if there were any liens or encumbrances against Holiday or its assets. Indeed, the agreement did not impose this obligation on either party; each party should have taken steps to protect itself, and neither did so.

The SBA acted unreasonably in approving the Holiday loan guaranty, and cannot be heard to complain that it now has to bear 90% of the loss, where it guaranteed 90% of the loan. The SBA imprudently relied on the fact that the loan was acceptable to a bank which had a prior working relationship with the borrower. More importantly, the SBA unreasonably approved the loan without reviewing a Dun & Bradstreet credit report on the applicant. We are not concerned with whether ordering such a report was technically part of the SBA's "standard operating procedures." These reports are ordered as a routine part of the SBA's operations in considering a guaranty application, as they should be. Nor are we concerned with whether the SBA ever received the credit report. It was unreasonable for the SBA to approve the loan without considering the report, whether the report was in its possession or not. In fact, both the Chief of the SBA's Financing Division and the loan specialist handling this loan admitted that they would not have approved the loan if they had seen the report.

As noted below, the direct cause of the SBA's loss was Holiday's fire and subsequent default. In a broader sense, its loss was caused by its own approval of a loan guaranty application which should have been denied. The fact that the loan and the guaranty were approved was at least as much the SBA's fault as it was the Bank's fault. We are not holding that, by failing to review the D & B report, the SBA breached the agreement between itself and the Bank in any way. We are only pointing out that, given its extreme negligence, allowing the SBA to escape liability would be to grant it an "unfair and unreasonable advantage." We also call attention to the SBA's conduct to emphasize, more generally, the fairness of allowing it to bear the $411,000 liability.

■ Besides arguing that the Bank breached the agreement between the parties, the SBA also argues that the Bank failed to comply with several conditions precedent to the SBA's guaranty obligation, thus releasing the SBA from all liability. The SBA then argues that the condition precedent analysis and the above materiality analysis are separate, and that the failure of a condition precedent releases the SBA from its obligation regardless of the materiality of the failure. We find, however, that the failure of a condition precedent must also be material before it excuses performance by the SBA. This finding is supported by *First Interstate* and the Restatement of Contracts. *First Interstate,* 868 F.2d at 344; Restatement of Contracts, § 225(1). To the extent that the SBA is arguing that the Bank's improper disbursement is the failure of a condition precedent rather than a breach of contract, under the above analysis this failure was not material and did not excuse the SBA's performance.

We have previously found that the Bank's acceptance of the unauthorized amounts for loan repayments was the only breach of the agreement between itself and the SBA. We also have not found any other violations of the agreement, whether breaches of the agreement or failures of

conditions precedent. If any such violations were found to exist, we do not believe they would be material under *Eastern.* The SBA thus cannot avoid liability on its guaranty obligation.

### B. Effect of Statute of Limitations on Count II

In Count II, the SBA seeks recovery for several alleged misrepresentations made by the Bank. Specifically, the SBA alleges that, in its Lender's Application, the Bank misrepresented the amount of money owed to it by Holiday and Cohodes' creditworthiness and financial condition, and that the SBA relied on these misrepresentations. Count II of Plaintiff's Complaint, ¶¶ 8, 9. The SBA also alleges that by making a demand for payment on the guaranty, the Bank falsely certified that it had disbursed the loan proceeds in accordance with the Agreement and Authorization, and that the SBA relied on this false certification. (Count II, ¶¶ 12, 13). In paragraph 16, the SBA alleges that the Bank's failure to disclose or correct these misrepresentations, "whether negligent or otherwise," constituted a material breach of the Bank's "duty of care and/or good faith" owed to the SBA under the common law and under the Agreement, and caused the SBA to suffer a loss. The SBA further alleges that the Bank's misconduct and breach of the agreement released it, as a matter of federal law, from its guaranty obligation. (¶ 17).

The Bank argues that Count II is essentially a tort claim, and as such is barred by the three-year statute of limitations for tort claims asserted by the United States. 28 U.S.C. § 2415(b). The SBA contends that Count II is really a contract claim, and is thus subject to the six-year statute of limitations governing contract claims asserted by the U.S. 28 U.S.C. § 2415(a). We find that Count II is more in the nature of a tort claim and that it is thus barred by the three-year statute of limitations of 28 U.S.C. § 2415(b).

In determining the proper statute of limitations to apply, a court should focus on the "substance of a claim." *Blusal Meats,*

*Inc. v. United States,* 638 F.Supp. 824, 831 (S.D.N.Y.1986). Determining the "substance of a claim" involves looking at the factual basis for the claim. *Id.* at 832. In this case, the SBA's claim in Count II is in the nature of a tort claim. While the SBA refers to contract provisions, alleges that these provisions were breached, and also refers to payment "by mistake (Count II, ¶¶ 19–20)," the essence of Count II is a tort claim. The factual basis for Count II is the Bank's alleged wrongful misrepresentations concerning Cohodes' financial condition and the Bank's proper disbursement of the loan, misrepresentations which caused it to suffer a loss. The SBA repeatedly alleges that it relied upon the Bank's alleged misrepresentations. (Count II, ¶¶ 9, 13, 15). To allege that someone relied on the intentional or negligent misstatements of another is to allege the elements of negligent misrepresentation or fraud, both of which are torts. *See Zahorik v. Smith Barney, Harris Upham & Co.,* 664 F.Supp. 309, 313 (N.D.Ill.1987); *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 719 F.2d 1335, 1347 (7th Cir.1983). The "substance" of Count II is a tort claim, and our conclusion is not altered by the SBA's attempt to mix in language related to contractual or quasi-contractual theories.

Because it is a tort claim, Count II is subject to the three-year statute of limitations of 28 U.S.C. § 2415(b). There is no dispute that this suit was not filed within the three-year statute of limitations. The statute of limitations on Count II would begin to run, at the latest, when the SBA knew or should have known that the Bank's statements were false. *See Blusal,* 638 F.Supp. at 832. As suit was filed on April 14, 1987, the SBA's claim is barred if it knew or should have known of the falsity of the Bank's misrepresentations on or before April 14, 1984. While the parties do not discuss the date on which SBA's tort claim accrued, it is obvious that this occurred sometime before April 14, 1984, as the last alleged misrepresentation was made on April 10, 1981, when the Bank requested payment under the guaranty. In fact, while the SBA debates the applicability of the three-year statute of limita-

tions, it does not dispute the Bank's contention that its claim would be barred under a three-year statute of limitations. Count II is barred by the three-year statute of limitations contained in 28 U.S.C. § 2415(b).

We have found that Count II is essentially a tort claim. Even if we were to find that Count II is a contract claim, it is unlikely that it would withstand a motion for summary judgment. To the extent that Count II seeks damages for breach of the agreement between itself and the Bank, the Bank would prevail on summary judgment because the alleged breaches of this agreement, whether misrepresentations or other breaches, would not be material, for the reasons set out in Part II.A of this opinion.

C. False Claims Act

■ In Count III the SBA seeks recovery of damages under the False Claims Act ("Act"), 31 U.S.C. § 3729–31. The Act allows the government to recover a $5000 to $10,000 penalty plus three times its money damages when a person knowingly presents a false claim for payment to the United States. 31 U.S.C. § 3729. The Bank contends that the SBA cannot recover under the False Claims Act because it cannot demonstrate the existence of a causal relation between the false claim and the government's loss, as required by *United States v. Hibbs*, 568 F.2d 347 (3d Cir.1977).

The False Claims Act, which was amended in 1982 and in 1986, now reads in relevant part as follows:

> Any person who—(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval ... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

31 U.S.C. § 3729(a). *Hibbs* involved a real estate broker who submitted certificates to the Federal Housing Administration which misrepresented the condition of certain houses. 568 F.2d at 349. After the FHA insured the mortgages on the houses, their owners defaulted for various reasons. All of the defaults were due to personal financial problems, such as losing a job or suffering a cut in pay. *Id.*, n. 2. None of the reasons were related to the defendant's false certifications. *Id.* The court held that the United States was required to demonstrate that a "causal connection" existed between the loss and the fraudulent conduct, and that the government in that case could not make such a showing. *Id.* at 351. The court expressly held that the government could not recover under the Act merely by demonstrating the existence of "but-for" causation, i.e., by showing that it would not have insured the mortgage if the defendant had not furnished the false certification. *Id.* at 349, 351. The Fifth Circuit accepted the *Hibbs* holding in *United States v. Miller*, 645 F.2d 473, 475–76 (5th Cir.1981).

The *Hibbs* requirement, strictly speaking, is not a "causation" requirement. A false statement can never really "cause" a loss. Rather, the *Hibbs* court was requiring that there be some sort of relationship between the false statement and the event which caused the government's loss. *Id.* at 351. The court read such a requirement from the statutory language, which at that time was that the government could recover damages sustained "by reason of" the defendant's unlawful act. *Id.* While, again, the causation-type language might not be technically correct, this language indicated that Congress meant to require some sort of relationship between the false statement and the government's loss. In addition, the *Hibbs* court noted that allowing the government to recover merely upon demonstrating "but-for" causation could easily lead to inequitable results. *Id.*

The SBA cannot seriously argue that it meets the *Hibbs* requirement in this case. The Bank's claim for payment was "false" because the Bank represented that it had properly disbursed the funds when in reality it had improperly applied $86,000 to retire prior debt. The SBA's loss was un-

related to the Bank's false statements; it was caused by the fire to the dealership, and by Holiday's subsequent default.

The SBA devotes most of its discussion of the False Claims Act issue to its argument that the *Hibbs* requirement should not apply. We reject its challenges to the reasoning of the *Hibbs* decision itself, for we find the opinion to be well-reasoned and persuasive. The SBA also contends that *Hibbs* should no longer be applied because the statute has been amended since the *Hibbs* decision. While the statute has been amended twice since 1977, neither of the amendments have had anything to do with the *Hibbs* requirement. *See* "Explanatory Notes" to 31 U.S.C.A. § 3729 (West 1983), and "Historical Note" contained in 1989 Pocket Part thereto (West 1989).

The SBA also argues that *Hibbs* is no longer applicable because it relied on the "by reason of" language in the statute as it existed in 1977. The "by reason of" language, however, was replaced in the 1982 recodification and amendment to the statute by the present language, which refers to damages the government sustains "because of" the act of the defendant. 31 U.S.C. § 3729; *see United States v. Hill*, 676 F.Supp. 1158, 1180 (N.D.Fla.1987). This new language supports the *Hibbs* requirement as well as the "by reason of" language. *See Hill*, 676 F.Supp. at 1180. In fact, while the 1982 Notes refer to the deletion of the "by reason of" language, they do not refer to the inclusion of the "because of" language, suggesting that the change reflects nothing more than a wording preference. Finally, the SBA points to a statement in Senate Report No. 99–345 which criticizes the *Hibbs* decision. S.Rep. No. 99–345, 99th Cong. 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Ad. News 5266, 5285. It is clear from the context of this quote, and a review of the 1986 Act as passed, that this language refers to a proposed amendment which was never adopted. *Id.;* Pub.L. 99–562, 100 Stat. 3153–54 (1986); *Hill*, 676 F.Supp. at 1181, n. 27. The *Hibbs* requirement that the government show some relationship between the defendant's false statement and its damages is equally applicable to the present statute as amended. Because the SBA cannot demonstrate that such a relationship exists, it cannot recover under the False Claims Act.

## III. CONCLUSION

For the above reasons, plaintiff's Motion to Strike Exhibit to Defendant's Motion for Summary Judgment is denied. Plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted.