**UNITED STATES of America, Plaintiff–Appellee,**

v.

**STUMP HOME SPECIALTIES MANUFACTURING, INCORPORATED, et al., Defendants–Appellants.**

No. 89–2573.

United States Court of Appeals, Seventh Circuit.

Argued May 9, 1990.

Decided June 29, 1990.

Andrew B. Baker, Jr., Clifford D. Johnson, Asst. U.S. Attys., Hammond, Ind., for plaintiff-appellee.

Joseph V. Simeri, Kramer, Butler, Simeri, Konopa & Laderer, South Bend, Ind., for defendants-appellants.

Before POSNER and FLAUM, Circuit Judges, and WILL, Senior District Judge.[*]

POSNER, Circuit Judge.

The United States sued the guarantors of a loan that, upon the borrower's defaulting, had been assigned to the Small Business

---

[*] Hon. Hubert L. Will, of the Northern District of   Illinois, sitting by designation.

Administration, another guarantor of the loan. After a bench trial, the district judge awarded the United States a judgment for the unpaid principal balance of the loan, some $222,000, plus interest of some $253,-000. The guarantors appeal, denying liability and raising fascinating questions of contract law.

■ Whose contract law? The Supreme Court has told us that in suits growing out of disputes over loans guaranteed by the Small Business Administration, we should use the relevant state's law—here, the law of Indiana—as the federal common law applicable to such disputes. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). See also *United States v. Kelley*, 890 F.2d 220 (10th Cir.1989); *United States v. Irby*, 618 F.2d 352, 355 (5th Cir.1980). It might be questioned whether we have always been completely faithful to this mandate, for in one case we described the issue as one of *general* federal common law, uncabined by any particular body of state-law doctrines, *Eastern Illinois Trust & Savings Bank v. Sanders*, 826 F.2d 615, 616 (7th Cir.1987), and in other cases we applied state law but implied that we had a choice whether to do so. *United States v. Meadors*, 753 F.2d 590, 592 (7th Cir.1985); *United States v. Lair*, 854 F.2d 233, 237 (7th Cir.1988). Unless *Kimbell*, which involved the priority of a lien held by the Small Business Administration rather than the enforcement of a guaranty, is to be read narrowly—and we can think of no reason why it should be— we are under a directive from the Supreme Court to apply state law to conditions in SBA loan agreements. So that is what we must do. We can do it in good heart. State commercial law is as suitable to the governance of those agreements as it is to the governance of any other type of loan, and the federal courts have neither the time nor the specialized knowledge to forge a new body of commercial law; by doing so they would simply be adding to the already excessive complexity of American law. *Powers v. U.S. Postal Service*, 671 F.2d 1041 (7th Cir.1982). Maybe a case will arise someday in which applying state law would interfere unreasonably with the ad-

ministration of the Small Business Administration's programs, and then the rule of *Kimbell* might have to be qualified. It is enough for purposes of this case to make clear that, as a general rule, state law applies to disputes arising from loan agreements with the Small Business Administration.

Some unusual facts redeem this case from dryness. Stump Home Specialties Manufacturing, Inc., a small family company that makes sewing chairs and cabinets, applied for a loan of $270,000 from a bank in South Bend, Indiana, the loan to be guaranteed by the SBA. Without the guaranty, the bank would not have made the loan. The loan was to be for seven years. The borrower preferred a fixed rate of interest. The bank's loan officer demanded, and the borrower agreed to, a fixed rate of 9.5 percent, and the SBA approved the loan on those terms. The bank's loan committee, however, did not want a fixed rate, and it approved the loan at a floating rate of 1.5 percent over the bank's prime rate. With the SBA having approved a fixed-interest loan and the bank's loan committee a variable-interest loan, the bank's loan officer took the unusual step of preparing two promissory notes for the borrower (Stump) to sign at the closing, one specifying the fixed rate of 9.5 percent, the other the variable rate of 1.5 percent above the bank's prime. The loan agreement itself stated that the interest rate was a flat 9.5 percent.

Present at the closing were Stump's two principal officers, plus five other members of the Stump family who, however, did not and do not participate in the company's management. The officers signed both notes on behalf of the company, along with the loan agreement itself; at the same time, all seven Stumps (who are defendants in this case along with Stump itself) signed a standard-form SBA guaranty that authorized the lender, "in its uncontrolled discretion and without any notice to the undersigned, ... to modify or otherwise change any terms of all or any part of the liabilities or the rate of interest thereon (but not to increase the principal amount of the note

...).'' The bank handed over the money at the closing, and the bank's loan officer then sought the SBA's approval for the variable-interest note, that being the form of loan that the bank preferred. The SBA approved everything but the use of the bank's prime rate as the basis for computing the variable interest. It asked that the loan agreement be amended to make the interest rate 1.5 percent over the New York prime rate. The bank agreed, and mailed Stump a draft agreement amending the loan agreement to change the interest rate from the flat 9.5 percent in the agreement to 1.5 percent above the New York prime rate. No notice of the amendment was sent to the guarantors as such, although the two officer-guarantors must have had notice, for they signed the amended agreement and mailed it back to the bank.

The loan had been made in April 1978, and the agreement was amended in June. The default came in 1982, and the bank assigned its rights to the SBA. On the date of default the New York prime rate was 16 percent; the interest rate called for by the amended agreement was therefore 17.5 percent. Consistent with the amended agreement and with SBA regulations, the interest due on the loan was frozen at the rate applicable on the date of default—a rate far above the 9.5 percent rate in the original loan agreement. The company could not pay, and the guarantors would not pay. The consequence was this suit, filed in 1985.

The guarantors make two major arguments (their subsidiary arguments have too little merit to warrant discussion). The first is that guarantors cannot be held liable when the obligation they have guaranteed has been modified without their consent. This argument has no possible merit with regard to the two officer-guarantors— they signed the amending agreement that the bank sent them, and if as their counsel contends they did so without consulting a lawyer and perhaps without even reading the agreement, that is their tough luck. Rights under a contract are not forfeited by the other party's failure to read it.

Credit Alliance Corp. v. Campbell, 845 F.2d 725, 728 (7th Cir.1988) (applying Indiana law); Carney v. Central National Bank, 450 N.E.2d 1034, 1038 (Ind.App. 1983). But we must consider the situation of the other guarantors. The SBA acknowledges that they knew nothing of the modification. They had, however, signed a guaranty which said that the lender could modify the terms of the loan without notice to them. Which is just what happened. A waiver of the guarantor's right to be discharged if there is a material change in the terms of the debt that he has guaranteed is valid. Credit Alliance Corp. v. Campbell, supra, 845 F.2d at 728–30 (applying Indiana law); Houin v. Bremen State Bank, 495 N.E.2d 753, 759 (Ind.App.1986); Jackson v. Farmers State Bank, 481 N.E.2d 395, 400 (Ind.App.1985); Skrypek v. St. Joseph Valley Bank, 469 N.E.2d 774, 777–79 (Ind.App.1984); Bowyer v. Clark Equipment Co., 357 N.E.2d 290, 294 (Ind. App.1976); Aetna Life Ins. Co. v. Anderson, 848 F.2d 104, 107 and n. 10 (8th Cir.1988). Freedom of contract is alive and well, and it is living in Indiana. Amoco Oil Co. v. Ashcraft, 791 F.2d 519 (7th Cir.1986).

The guarantors argue that the provision on modification could not have meant what it said. It excepted increases in the principal amount of the loan from the right of modification without notice; such increases therefore required the guarantors' consent if they were to bind them. The guarantors argue that to double the interest rate is to enlarge their guaranty just as surely as increasing the principal of the loan would do.

But did the modification double the interest rate? Although the loan agreement specifies a flat 9.5 percent rate of interest, far below the 17.5 percent rate at which Stump's obligation was frozen by the modified agreement, Stump had also signed a promissory note specifying a variable interest rate of 1.5 percent over the bank's prime. The record does not reveal whether the bank's prime rate turned out to be higher than, lower than, or the same as the New York prime rate during the relevant period (which runs from the date of the loan to the date of the default). For all we

know, the modification harmed the guarantors not at all.

This analysis is incomplete, however, because the guarantors (other than the officers, of course) may not have been aware of the variable note when they signed the guaranty. The loan agreement itself contains no reference to variable interest—just to 9.5 percent fixed interest. The relevant modification, so far as the nonofficer guarantors are concerned, may therefore have been a change from a fixed interest rate of 9.5 percent to a floating interest rate based on the New York prime rate—and that change has proved to be highly adverse to the guarantors, for sure.

No matter. This modification, too, was within the letter of the quoted provision. And it did not violate the spirit of the exception for changes in principal. There is a difference, so far as holding guarantors liable is concerned, between increasing the principal of the loan they have guaranteed and increasing the interest rate on the loan. The borrower and the lender would have a powerful incentive to increase the principal if the guarantors were automatically bound, since the guarantors would be bearing much of the additional risk of a larger loan yet would not be compensated for their additional risk-bearing. The danger that the lender and the borrower will conspire against the guarantor is eliminated or at least greatly diminished when the modification relates to any other term of the loan, including the interest rate. If for example the lender seeks a higher interest rate, the borrower has every incentive to resist, so if he accedes there is a presumption that, all things considered, the higher rate makes good business sense. Increasing the interest rate is a benefit to the lender but a cost to the borrower; increasing the principal, however, is a benefit to both, creating an incentive to collude. This is the economic rationale for the distinction in the SBA's guaranty form between increases in principal and other modifications, and shows that the form is not incoherent and in need of heroic interpretation, as the guarantors contend. Moreover, it is only after the fact that the modification in this case, even if conceived of as a change

from a fixed to a variable rate rather than a change in the method of computing the variable rate, turned out to entail a higher interest rate. If interest rates had fallen rather than risen in the late 1970s and early 1980s, the New York prime rate plus 1.5 percent might have been less than 9.5 percent.

The guarantors' second major argument is that the modification in the loan agreement is unenforceable because not supported by consideration. The black-letter rule is indeed that a contract may not be modified without consideration. *A & S Corp. v. Midwest Commerce Banking Co.*, 525 N.E.2d 1290, 1292 (Ind.App.1988); *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1285 (7th Cir. 1986); Farnsworth, Contracts 271–73 (1982). (The UCC abrogates the rule for sales of goods, UCC § 2–209(1), but we do not have a sale of goods in this case.) And yet the cautionary, evidential, and other policies behind the requirement of consideration do not apply, or apply only with much attenuated strength, in the context of written modification. By hypothesis the parties already have a contract, so that the danger of mistaking casual promissory language for an intention to be legally bound is slight; moreover, we deal here with a written, not an oral, modification, so fabrication of a promise is harder.

The requirement of consideration has, however, a distinct function in the modification setting—although one it does not perform well—and that is to prevent coercive modifications. Since one of the main purposes of contracts and of contract law is to facilitate long-term commitments, there is often an interval in the life of a contract during which one party is at the mercy of the other. A may have ordered a machine from B that A wants to place in operation on a given date, specified in their contract; and in expectation of B's complying with the contract, A may have made commitments to his customers that it would be costly to renege on. As the date of scheduled delivery approaches, B may be tempted to demand that A agree to renegotiate the contract price, knowing that A

will incur heavy expenses if B fails to deliver on time. A can always refuse to renegotiate, relying instead on his right to sue B for breach of contract if B fails to make delivery by the agreed date. But legal remedies are costly and uncertain, thereby opening the way to duress. Considerations of commercial reputation will deter taking advantage of an opportunity to exert duress on a contract partner in many cases, but not in all: For examples of duress in the contract-modification setting, see *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971), and *Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir.1902); and for general discussion see *Selmer Co. v. Blakeslee–Midwest Co.*, 704 F.2d 924 (7th Cir.1983); *Richards Construction Co. v. Air Conditioning Co. of Hawaii, Inc.*, 318 F.2d 410, 413–14 (9th Cir.1963), and Farnsworth, *supra*, at 271–78.

■ The rule that modifications are unenforceable unless supported by consideration strengthens A's position by reducing B's incentive to seek a modification. But it strengthens it feebly, as we pointed out in *Wisconsin Knife Works v. National Metal Crafters, supra*, 781 F.2d at 1285. The law does not require that consideration be adequate—that it be commensurate with what the party accepting it is giving up. Slight consideration, therefore, will suffice to make a contract or a contract modification enforceable. *Wilson v. Dexter*, 135 Ind.App. 247, 251–52, 192 N.E.2d 469, 472 (1963); Simpson, Handbook of the Law of Contracts 82, 87–88 (2d ed. 1965); cf. *A & S Corp. v. Midwest Commerce Banking Co., supra*, 525 N.E.2d at 1293. And slight consideration is consistent with coercion. To surrender one's contractual rights in exchange for a peppercorn is not functionally different from surrendering them for nothing.

The sensible course would be to enforce contract modifications (at least if written) regardless of consideration and rely on the defense of duress to prevent abuse. *Wisconsin Knife Works v. National Metal Crafters, supra*, 781 F.2d at 1286; UCC § 2–209, official comment 2; Hillman, *Contract Modification Under the Restatement (Second) of Contracts*, 67 Cornell L.Rev. 680 (1982). All coercive modifications would then be unenforceable, and there would be no need to worry about consideration, an inadequate safeguard against duress. But we need not decide whether the Indiana Supreme Court is prepared to take the bold step of abolishing the requirement of consideration in modification cases; there was consideration here.

■ To begin with, when two parties agree to substitute a certain for an uncertain quantity, both benefit to the extent necessary to satisfy the requirement of consideration. To the risk averse—and most people are risk averse in most of their important personal and business dealings—uncertainty is a bad, and to be relieved from uncertainty is therefore a good. In many cases it may be a good of indeterminable value, but that is no obstacle to its being treated as consideration. *Wilson v. Dexter, supra*, 135 Ind.App. at 252–53, 192 N.E.2d at 472; *Kincaid v. Lazar*, 405 N.E.2d 615, 620 (Ind.App.1980). Conversely, the substitution of an uncertain for a certain quantity would be a bad to the risk averse. The present case might seem to be such a case if, as the guarantors plausibly contend, the modification was of a flat interest rate, the 9.5 percent specified in the loan agreement, rather than of the original variable interest rate, the rate based on the lending bank's own prime rate. However, the substitution of an uncertain rate—a floating rate—for a fixed rate only looks like moving from certainty to uncertainty. From the lender's standpoint the fixed rate is a source of unwanted risk—the risk that interest rates will rise and the lender therefore be stuck with a below-market rate. Ordinarily, if interest rates fall, the borrower can borrow at a lower rate and prepay the balance of the loan. Sometimes there is a penalty for prepayment, but there was not one in this case. In these circumstances, the substitution of a variable for a fixed rate does not increase risk but merely shifts it from lender to borrower.

All that this last point shows, however, is that the *lender* could not complain that the substitution of a variable for a fixed interest rate was not supported by consideration, because the substitution would shift risk from him to the borrower. The issue is whether the modification is enforceable against the *borrower*, and that depends on whether there was consideration for the borrower's surrendering a fixed for a variable rate. There was here; it was the loan itself. No variable rate, no loan. The bank (as distinct from its loan officer) never approved a loan to Stump at a fixed interest rate. That was the rate in the agreement, true, but the guarantors do not contend that the parol evidence rule or the doctrine of apparent authority or any other doctrine of contract law or of agency law would have empowered Stump to enforce the interest term in the agreement and ignore the variable-rate promissory note. The officer Stumps signed the promissory note carrying a variable interest rate at the same time that they signed the loan agreement, and by doing so they agreed to accept the variable interest rate if the bank's loan committee insisted on that rate, as it did. The "modification" of the interest term was not a real modification; that is, it was not the modification of an enforceable contract; it modified a tentative term and thereby completed the contract.

But this injects another issue. If the contract was not completed until the bank's loan committee decided which promissory note to accept, or alternatively until the officer Stumps signed the amending agreement, how can the guarantors be bound? All they guaranteed, surely, was the loan agreement, yet now we are suggesting that the agreement was only a way station on the road to the contract. But the guarantors do not argue that they guaranteed nothing. They argue that they guaranteed only the fixed interest obligation; that they guaranteed this much, however, they concede. They guaranteed a loan agreement with a fixed interest term *and* waived their right to abandon the guaranty if the terms (other than the amount of the principal) were altered. They thus are bound by the change to a variable interest rate, provided

there was consideration for this modification, and there was.

The propositions that the loan agreement wasn't "really" modified, and that the modification was supported by consideration, are reconcilable. The agreement was contingent on approval by the bank's loan committee and by the SBA. The guarantors guaranteed this contingent agreement. To make the contingent agreement actual, Stump had to agree to substitute a variable for a fixed rate of interest; this modification was supported by consideration, and is therefore enforceable against the guarantors.

■ An alternative interpretation of the confusing events in this case (but it leads to the same result) is that what was modified was not the 9.5 percent flat interest rate in the loan agreement and in the first promissory note, but rather the variable interest rate in the second promissory note. This was a "real" modification, because the loan agreement plus the second promissory note made a complete contract, one the guarantors guaranteed, as we have just seen. But the substitution of one variable rate for another has sufficient mutuality to satisfy the requirement—an attenuated requirement, as we have emphasized—of consideration. Since no one knew whether the bank's prime rate or the New York prime rate would be higher over the life of the loan, no one knew who would benefit from the substitution. The two rates happen to have been identical (8 percent) on the date of the loan, and for all we know were identical on the date of the default and are identical today. Because Stump could have benefited from the substitution, the requirement of consideration is satisfied.

■ This is a fiction, however, and we prefer a practical ground of decision. The substitution of one method of computing the variable interest for another method was not coercive. Neither the bank nor the SBA was trying to take advantage of Stump. Perhaps the bank had already taken advantage of Stump by forcing a variable interest rate on it, thereby shifting to Stump the risk of any change in prevailing

interest rates over the life of the loan. But that was water under the bridge. There was no increment of disadvantage. The modification helped the bank because it was the condition of obtaining a guaranty from the SBA, but it did not hurt Stump, because there was no ascertainable difference in risk or return between the New York prime rate and the bank's prime rate. We can see no reason therefore why the modification should not be enforced.

Why the SBA insisted on the change the record does not reveal. We are told that it is the SBA's policy to insist that floating interest rates be based on the New York prime rate, but we are not told why. We can guess. A prime rate is an estimated rather than an actual price ("merely a bank's forecast of what it would charge its most creditworthy corporate customers for a 90–day unsecured loan ... [and] not an actual transaction price," *Mars Steel Corp. v. Continental Illinois National Bank & Trust Co.*, 834 F.2d 677, 682 (7th Cir.1987)), and an individual bank's prime rate may well be an unreliable estimate of the market price. If this is so, the modification may have benefited Stump and the guarantors ex ante (i.e., looking forward from the time the agreement and guaranty were made) by reducing uncertainty.

The reason for the modification is a detail, however; and even to speak in terms of modification is artificial in this case, the reality being that the terms of the loan were open when the loan was signed and the proceeds handed over to Stump. The interest rate had not been determined. It was a matter of indifference to Stump and to the guarantors precisely how the prime rate on which the variable interest charged for the loan would be determined. For Stump had no bargaining power in dealing with the bank. It needed the loan, and if the loan committee insisted on a variable rate, Stump would go along. The loan was not modified, it was completed, by the SBA's approving the loan on condition that the New York prime rate be substituted for the bank's prime rate. The guaranty was valid, and bound the guarantors to the terms of the "modified" loan.

AFFIRMED.