**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**FIRST NATIONAL BANK OF CICERO**
**and Leslie I. Cohodes, Defendants–**
**Appellees.**

**No. 90–2404.**

United States Court of Appeals,
Seventh Circuit.

Argued April 15, 1991.

Decided Feb. 27, 1992.

As Amended Feb. 27, 1992.

Linda A. Wawzenski, Asst. U.S. Atty. (argued), Crim. Div., Chicago, Ill., for plaintiff-appellant.

Stephen C. Voris (argued), Clinton J. Wesolik, Burke, Wilson & McIlvaine, Chicago, Ill., for First National Bank of Cicero.

Stephen C. Voris, Burke, Wilson & McIlvaine, Chicago, Ill., for Leslie I. Cohodes.

Before BAUER, Chief Judge, and COFFEY and MANION, Circuit Judges.*

COFFEY, Circuit Judge.

The United States appeals a summary judgment entered in favor of First National Bank of Cicero, denying the United States recovery of both an allegedly improperly

---

* Because this opinion is in conflict with the decisions in *United States v. Hibbs,* 568 F.2d 347 (3d Cir.1977), *United States v. Miller,* 645 F.2d 473 (5th Cir.1981), and *United States v. Thomas,* 709 F.2d 968 (5th Cir.1983), it has been circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(f). A majority of the court did not favor a rehearing *en banc.* Judge Ripple voted to hear the case *en banc.*

paid Small Business Administration loan guaranty in the amount of $410,721.29 and of treble damages under the False Claims Act, 31 U.S.C. § 3729. We reverse and remand for trial.

## I. FACTS

In 1980 the Small Business Administration ("SBA") created the Automobile Dealers Loan Guaranty Plan, designed to provide immediate financial assistance to automobile dealers suffering from a severe economic downturn. Under the program, the automobile dealers received bank loans guaranteed by the SBA. In a previous opinion, we described the SBA guaranty loan program:

> The SBA operates a guaranty loan program that assists small businesses in obtaining financing on reasonable terms when money is unavailable from other sources. See 15 U.S.C. § 631 et seq. Participating banks normally enter into a guaranty agreement with the SBA, setting out procedures and requirements for the guaranteed loan program. When a qualified borrower applies to a bank for an SBA-guaranteed loan, the bank must obtain authorization from the SBA to proceed with the loan. After SBA approval, the bank lends its own funds to the borrower and services the loan pursuant to the guaranty agreement. If the borrower defaults, the bank may demand that the SBA purchase its share of the outstanding balance—typically, and in this case, 90% of the balance.

*Eastern Illinois Trust and Savings Bank v. Sanders*, 826 F.2d 615, 616 (7th Cir. 1987).

Leslie Cohodes was president and owner of Holiday Oldsmobile, Inc., an automobile dealership located in Cicero, Illinois. In February 1980, Holiday obtained two loans from the First National Bank of Cicero, Ill. ("Bank") totalling $165,000. In May, Holi-day Oldsmobile refinanced another loan from the Bank, this one for $14,616, and increased it by $10,000.

In June 1980 the SBA and the Bank entered into a Loan Guaranty Agreement making the Bank eligible to lend money with an SBA guaranty. After the announcement of the SBA automobile dealer loan guaranty plan, Cohodes spoke with the Bank's president, Joseph Schuessler, about the possibility of obtaining a guaranteed SBA loan from the Bank. According to Schuessler's deposition, he and Cohodes discussed a loan in the amount of between $75,000 to $100,000 for working capital. Schuessler also suggested that Cohodes might contact a business consultant, Gregory Xylas, who specialized in preparing SBA applications, as the Bank lacked expertise in preparing them. Schuessler informed Bank vice president William Giova that Giova was to process the Holiday Oldsmobile loan application and that the application would be packaged by Xylas.

Gregory Xylas did, in fact, prepare an SBA guaranteed loan application package for Holiday Oldsmobile. The application requested a loan in the amount of $493,000, rather than the smaller amount that Schuessler and Cohodes had originally discussed. In his deposition, Cohodes stated that he signed many of the pages of the Loan Application in blank or without reviewing them. Cohodes also admitted that the application was riddled with inaccuracies. Cohodes had not been in the automobile dealership business for forty years, as stated in the application. Furthermore, Holiday owed Cohodes $450,000, not the $160,000 he claimed. In addition, the corporate tax return attached to the Loan Application was incorrect and listed gross sales figures that were far too low. The credit references page of the Loan Application was also inaccurate.[1]

---

1. Among the documents submitted to the SBA was a loan form indicating Cohodes paid Xylas $250 for preparing the loan application. In fact, Cohodes paid Xylas $3,800 in cash and gave him a new 1981 Oldsmobile worth $12,200 in exchange for preparing the package. Cohodes pled guilty in March 1986 to knowingly making false statements to a government agency in violation of 18 U.S.C. § 1001 (1982) in connection with this deception about Xylas' compensation. He was sentenced to nine months imprisonment by the United States District Court for the Northern District of Illinois, Eastern Division. Xylas died before he could be

This Holiday Loan Application was submitted to the Bank. William Giova, the bank employee assigned by Schuessler to handle the Loan Application, stated in his deposition that he doubted that he did anything to check the application because Schuessler had told him to take care of the loan and furthermore he knew Cohodes was a customer of the Bank. The Bank failed to make, prior to the disbursement of the loan, any search of the public records to determine whether there were any liens, claims or encumbrances against Holiday and its assets.

On September 12, 1980, the Bank forwarded a Lender's Application to the SBA for a 90% guaranty of a loan to Holiday in the amount of $493,000. The application was signed by Giova, who recommended its approval. Giova was the only bank employee who reviewed or analyzed the document. The SBA considered the application and authorized the requested guaranteed loan on October 10, 1980.

The loan was approved on October 27, 1980. On that same date, after the approval of the loan, Bank President Schuessler learned for the first time that the loan was increased to $493,000 from the $75,000 to $100,000 he had discussed with Cohodes. When he observed a bank employee about to return to Cohodes certificates of deposit that had been pledged as collateral on a previous loan, Schuessler ordered that the certificates be retained as additional collateral on the SBA guaranteed loan. Schuessler, however, did not take any action to modify or cancel either the loan or its terms. He also failed to inform the SBA that he was retaining the additional collateral to protect the Bank against default on the SBA loan.

charged for his role in the preparation of the application.

2. After the default by Holiday, the Bank provided the SBA with $50,000 from the certificates of deposit Schuessler had retained as additional collateral to be applied against Holiday's debt. The SBA claims that it should have received ninety percent of the $100,000 or $110,000 in certificates of deposit that Schuessler retained as additional collateral.

3. 31 U.S.C. § 3729 provides, in pertinent part:

The settlement sheet submitted to the SBA following closing reflected that the loan proceeds were to be distributed as follows:

$ 60,000.00  Purchase mach. equip. etc.
$ 68,000.00  Purchase inventory
$100,000.00  Pay accounts payable
$171,000.00  Payment of loan–[1st N/B of Cicero]
$ 94,000.00  Working capital

Pursuant to these terms, the Bank received a check from Holiday Oldsmobile for $171,000 on October 27, 1980 and deposited the remaining $322,000 of the loan proceeds in Holiday's checking account. On October 28, 1980, Holiday made payments to the Bank totalling $86,500 on three previous loans from the Bank. These payments were not reflected in the settlement sheet filed with the SBA.

Holiday made payments to the Bank on the SBA guaranteed loan from the time the loan was disbursed until March 1981. On March 8, 1981, the Holiday Oldsmobile building was destroyed by fire. Soon after, Holiday defaulted on its loan payments. The SBA received a request from the Bank on April 17, 1981, to fulfill its obligations as guarantor of ninety percent of the Holiday loan. In June 1981, the SBA paid the bank ninety percent of the outstanding balance due on the loan[2] ($410,710.29).

On April 14, 1987, the United States filed suit against the Bank and Cohodes in the district court seeking repayment of the guaranty under theories of breach of contract (Count One) and quasi-contract (Count Two). The complaint also requested an award of treble damages for a violation of the False Claims Act, 31 U.S.C. § 3729 (Count Three).[3] In its answer to the com-

"**§ 3729. False claims**
(a) **Liability for certain acts.**—Any person who—
   (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
   (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

plaint, the Bank filed a cross-claim against Cohodes based upon fraud, negligent misrepresentation, indemnity and contribution. Neither Cohodes nor anyone on his behalf appeared to defend or contest the action and default judgments were entered against him in favor of both the Bank and the United States. Following cross-motions for summary judgment filed by both the United States and the Bank, the district court entered summary judgment in favor of the Bank and against the United States. The court ruled that there was not a material breach of the contract between the Bank and the SBA (Count One). The trial court further determined that the claim alleged in Count Two was a tort claim which was time barred pursuant to the three-year statute of limitations contained in 28 U.S.C. § 2415(b).[4] Finally, the court decided that recovery under the False Claims Act (Count Three) was unavailable because the damages the government suffered were not caused by the Bank's alleged false claim. The United States appeals.

## II. ISSUES PRESENTED

The following issues are presented in this appeal: (1) Was the district court's entry of summary judgment proper in favor of the Bank on the United States' claim that it was entitled to refuse to honor the guaranty obligation because the Bank materially breached its contract with the government and/or failed to satisfy a condition precedent to the enforcement of this contract? (2) did the trial judge appropriately enter summary judgment in favor of the Bank on Count Two of the Government's complaint on the basis that this claim was time barred under 28 U.S.C. § 2415(b)? and (3) was the trial court's entry of summary judgment in favor of the Bank on the False Claims Act cause of action on the ground that the United States failed to present facts sufficient to establish that its damages were caused by the false claim proper?

## III. STANDARD OF REVIEW

This case presents the issue of whether the United States has presented a genuine issue of material fact sufficient to preclude the entry of summary judgment in favor of the Bank on any one of the government's three causes of action. "We review *de novo* a district court's grant of summary judgement." *Renovitch v. Kaufman*, 905 F.2d 1040, 1044 (7th Cir.1990). We have also made clear that,

> [s]ummary judgment should be granted only when no genuine issues of material fact exist and when the moving party is entitled to judgment as a matter of law.... This standard closely resembles that used for entry of a directed verdict, ... where the district court must direct a verdict if there can be only one reasonable decision made under the governing law.

*Central States, Southeast, and Southwest Areas Pension Fund v. Jordan*, 873 F.2d 149, 152 (7th Cir.1989) (citation omitted). We have also set out the appropriate analysis for determining when a genuine issue of material fact exists:

> A motion for summary judgment should be granted only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we must view the record and all of the inferences drawn therefrom in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Illinois v. Bowen*,

---

. . . .

is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ...

**4.** 28 U.S.C. § 2415(b) provides, in pertinent part:

**(b)** Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues ...

808 F.2d 571, 574 (7th Cir.1986). However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations that there is a *genuine* issue of material fact which requires trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*Beard v. Whitley County REMC*, 840 F.2d 405, 409–10 (7th Cir.1988).

## IV. CONTRACT CLAIM

The United States contends that the Bank failed to satisfy a condition precedent to enforcement of the Guaranty Agreement between the SBA and the Bank and/or materially breached the Guaranty Agreement. The United States argues that if either contention can be established, the SBA is released from honoring its agreement to satisfy ninety percent of the outstanding balance of Holiday's loan. The trial court determined that the government failed to raise a genuine issue of material fact as to these allegations and entered summary judgment dismissing the government's cause of action based in contract.

██ In determining whether the Bank's conduct constituted a material breach of the SBA guaranty agreement, the trial court applied the four-part test we set out in *Eastern Illinois Trust and Savings Bank v. Sanders*, 826 F.2d 615, 617 (7th Cir.1987). In *Eastern Illinois*, we held that the question whether a breach of an SBA agreement was material was governed by "general federal law." *Id.* at 616. After the district court issued its opinion in the instant case, we rejected "language in earlier opinions [including *Eastern Illinois*] indicating that federal common law applied [to SBA agreements] or that we had a choice in deciding which law to apply." *United States v. Fitzgerald*, 938 F.2d 792, 794 (7th Cir.1991); *see also United States v. Stump Home Specialties Manufacturing, Inc.*, 905 F.2d 1117, 1119 (7th Cir.1990). Instead, we held that, as a general rule, "in suits growing out of disputes over loans guaranteed by the Small Business Administration, we should use the relevant state's law ... as the federal common law applicable to such disputes." *Stump*, 905 F.2d at 1119. Both *Fitzgerald*, 938 F.2d at 794 n. 2, and *Stump*, 905 F.2d at 1119, recognized that there might arise a case in which applying state law would interfere unreasonably with the administration of the SBA's programs. This, however, is not such a case, and therefore we hold that Illinois law governs the dispute between the United States and the Bank arising from the SBA guaranty in the instant case.

As the district court itself recognized, the four-part *Eastern Illinois* materiality test it used in its analysis was derived from *Sahadi v. Continental Illinois National Bank & Trust Co.*, 706 F.2d 193 (7th Cir. 1983). *United States v. First National Bank of Cicero*, 736 F.Supp. 891, 898 (N.D.Ill.1990). The source of the *Sahadi* test, in turn, was Illinois' law governing materiality of contract breaches. *Sahadi*, 706 F.2d at 196–97. Thus, when the district court applied the *Eastern Illinois* materiality test in the instant case, it was in fact applying Illinois law, just as it should have. For the purposes of this opinion, we trace the district court's analysis using the *Eastern Illinois* test. However, we do so only because it accurately represents the controlling Illinois law.

In *Eastern Illinois*, we held that "[t]he question whether or not a particular breach of a contract is 'material' is a question of fact requiring detailed attention to all of the circumstances." 826 F.2d at 616 (citing *Sahadi*, 706 F.2d at 196). Four factors were identified as central to the materiality inquiry:

(1) [w]hether the breach operated to defeat the bargained-for objective of the parties; (2) whether the breach caused disproportionate prejudice to the nonbreaching party; (3) whether custom and usage considers such a breach to be material; and (4) whether the allowance of reciprocal nonperformance will result in

the accrual of an unreasonable and unfair advantage [to either party].

*Eastern Illinois,* 826 F.2d at 617. In applying this "materiality" analysis to the instant case, it is essential to bear in mind that, as discussed above, that denial of summary judgment requires that we determine only that a genuine issue of material fact exists, i.e., a reasonable finder of fact could determine that the record contains facts sufficient to support a finding of a material breach of the Guaranty Agreement.

■ The trial court found that the Bank's only breach of the Guaranty Agreement was its acceptance, in satisfaction of previous loans, of payments of $86,500 from Holiday which were not reflected in the Settlement Sheet the Bank had filed with the SBA. But, the trial court determined, under the *Eastern Illinois* analysis set forth above, that this breach was not a material one. Initially, the court found that "the breach did not significantly defeat the bargained-for objectives of the parties" because while the unauthorized repayment might have "had some effect on Holiday's ability to repay the guaranteed loan, ... this effect was not significant, given the percentage of this amount to the total loan amount." *Cicero,* 736 F.Supp. at 898. With respect to the factor of disproportionate prejudice to the SBA, the court noted that the SBA's loss "was caused by the fire and by Holiday's subsequent default, both of which were unrelated to the Bank's acceptance of the [$86,500]." *Id.* at 899. Furthermore, the court concluded that "the prejudicial effect of the Bank's breach on SBA policy ... does not justify releasing the SBA from its guaranty obligation where the financial prejudice to the SBA was caused by the fire and by Holiday's default, and not by the Bank's action." *Id.* Finally, the court determined that "allowing the SBA to escape its obligations under the guaranty would result in accrual of an unreasonable and unfair advantage to the SBA," because "[t]he parties do not seem to have intended that the Bank's accept-

ance of additional money to pay off prior loans would result in denial of the guaranty," and "because the SBA would be avoiding a debt which it would have incurred regardless of the Bank's conduct." *Id.*[5] To bolster its analysis the district court also pointed out that the Bank's conduct was not particularly egregious, *id.* at 899–900, and that the SBA had acted with "extreme negligence" in approving the loan guaranty. *Id.* at 900.

We agree with the trial court that a reasonable finder of fact could determine that the Bank's acceptance of excessive repayments of previous loans from the SBA guaranteed loan proceeds was a "breach" of the Guaranty Agreement's provision requiring that the Bank "close and disburse each loan in accordance with the terms and conditions of the approved loan authorization." *Cicero,* 736 F.Supp. at 896. The trial court's further determination, however, that there was no genuine issue of material fact raised dealing with the question of whether this breach was "material" presents some difficulty under the *Eastern Illinois* test because a reasonable fact finder could conclude that the parties' "bargained-for" objectives were frustrated by the Bank's breach of the Guaranty Agreement, that this breach caused "disproportionate prejudice" to the SBA, and that allowing reciprocal non-performance by the parties would not give the SBA an unreasonable advantage.

■ Our analysis of the question of the existence of a genuine issue of material fact dealing with the question whether the Bank's breach of the Guaranty Agreement was material begins with an examination of the first *Eastern Illinois* factor, the effect of the breach on the parties' "bargained-for objective." We believe that the trial court erred in its consideration of this issue when it focused solely on the effect that Holiday's excessive payments to the Bank had on Holiday's ability to repay the loan. In *First Interstate Bank of Idaho v. Small Business Administration,* 868 F.2d 340

---

**5.** The district court did not find the factor of "custom and usage" favored either party because "neither has presented any relevant evidence concerning custom in the industry or prior relations between the parties." *Cicero,* 736 F.Supp. at 899.

(9th Cir.1989), a case also involving excessive payments on previous loans from the proceeds of an SBA guaranteed loan, the Ninth Circuit considered whether such payments affected the bargained-for objective of the parties. The court observed:

> The bank contends that the bargained-for objective of the contract was not disturbed by its deviant disbursements, because CPI [the borrower] benefitted by having its prior debt load reduced, and the primary objective of helping CPI thus suffered no detriment. . . .

> Accepting the bank's contention that neither SBA nor CPI suffered financial harm, we nevertheless conclude that the bargained-for objective was defeated. The court in *Eastern Ill. Trust* recognized that in assessing a government program that is not profit-oriented, the court may consider nonfinancial objectives and prejudice. *Id.* . . .

> Furthermore, the specific amounts and purposes indicated in the loan authorization show SBA's interest in the continued growth of the borrower through capital improvements; these goals were denied through use of the funds to service CPI's debt to the bank, even if no specific financial harm accrued to CPI or the SBA. If the bank's argument is accepted, the specific authorizations in the contract were mere verbiage, subject to the bank's carte blanche to use the funds however it wished, absent specific financial harm to CPI or the SBA.

*First Interstate Bank,* 868 F.2d at 345. We agree with the Ninth Circuit that a fact-finder may properly consider the "nonfinancial objectives" of the guaranty loan program, including the borrower's growth through capital improvements, as well as quantifiable financial considerations, in determining whether the parties' bargained-for objectives were frustrated by the Bank's conduct. Thus, we are convinced that a reasonable fact-finder could conclude that the parties' objectives were frustrated by the Bank's acceptance of the excessive repayments on Holiday's previous indebtedness.

Similarly, we disagree with the district court's analysis of the second factor, "disproportionate prejudice" to the SBA. Again, the district court focused upon the effects of the excessive repayments of previous loans on Holiday's ability to repay the guaranteed loan and explicitly disagreed with the weight the Ninth Circuit accorded to the implicated SBA policy objectives. *See Cicero,* 736 F.Supp. at 899. We agree with the Ninth Circuit that nonfinancial prejudice to the SBA is an appropriate consideration in the disproportionate prejudice analysis and, like that court, "[w]e recognize the prejudicial impact of the bank's actions on the SBA's policy against allowing banks to apply large percentages of guaranteed loan proceeds to repay prior loans to the borrower." *First Interstate,* 868 F.2d at 345. Thus, a reasonable fact finder could well rely upon the second *Eastern Illinois* factor in determining that the excessive loan repayments to the Bank were a material breach of the Guaranty Agreement.

We are also unconvinced by the conclusion of the district court that the SBA would gain an unreasonable advantage if the court allowed reciprocal non-performance of the Guaranty Agreement by the SBA and the Bank. Nor do we agree with the district court's assertion that, in failing to honor the Guaranty Agreement "the SBA would be avoiding a debt which it would have incurred regardless of the Bank's conduct." *Cicero,* 736 F.Supp. at 899. Indeed, if there is a "material breach," the SBA is not required to honor the Guaranty Agreement, and, as we have discussed *supra,* two of the other relevant factors, the effect of the breach on the parties' bargained for objective and "disproportionate prejudice" to the SBA, support a material breach finding. Furthermore, the district court improperly accorded significant weight to its belief that "the SBA's loss was in large part due to its own negligence . . . in approving the Holiday loan guaranty . . ." *Cicero,* 736 F.Supp. at 900. In discussing whether negligence by a government employee in approving a federally guaranteed loan should obligate the government to honor the guaranty follow-

ing a breach of the guaranty agreement, we have observed:

> [T]he employees of the Economic Development Administration who supervised the transaction with the bank became aware of many of the bank's imprudent practices yet turned a blind eye. But nothing in the guaranty agreement enjoins the guarantor to vigilance—which scotches the suggestion that the government is guilty of a breach of contract too. Nor had these subordinate officials of the Economic Development Administration who exercised inadequate oversight in this matter any actual or apparent authority to modify the terms of the guaranty ... The Trade Act of 1974 authorizes the government to make risky loans (or loan guarantees)—indeed, *requires* that they be risky, since a condition precedent is that the borrower be unable to obtain financing on ordinary terms in the private capital markets. But the Act also requires that there be at least a reasonable assurance of payment, and this requirement was implemented by the altogether sensible provision in the guaranty agreement requiring the bank to act with the prudence of a normal commercial bank that had made a loan not guaranteed by the federal government. The failure of the Economic Development Administration's regional staff to insist upon compliance with this provision ... does not open the vaults of the Treasury to a bank that violated the provision.

*Citizens Marine National Bank v. United States Department of Commerce*, 854 F.2d 223, 229 (7th Cir.1988) (citation omitted, emphasis in original), *cert. denied, Bank One, Stevens Point, NA v. United States Department of Commerce*, 489 U.S. 1053, 109 S.Ct. 1312, 103 L.Ed.2d 582 (1989). Thus, we are convinced that a factfinder might reasonably conclude that no unreasonable advantage accrues to the SBA in allowing it to refuse to honor the guaranty because of the excessive Holiday payments to the Bank in satisfaction of previous loan obligations. Because we are of the opinion that a reasonable fact-finder could find, based upon a consideration of all of the relevant factors under Illinois law as set out in *Eastern Illinois*, that a genuine issue of material fact existed concerning whether the excessive payments in satisfaction of previous indebtedness constituted a material breach of the Guaranty Agreement, we remand the case for trial on the merits.

Finally, we note that genuine issues of material fact may well exist as to other potentially determinative questions. For example, several actions and omissions by the Bank could reasonably be viewed as constituting a material breach of the Guaranty Agreement. These include: the Bank's lack of care in making the loan; Bank President Schuessler's failure to cancel the loan when he discovered at the closing that it was for $493,000, far in excess of the $75,000–$100,000 he had discussed with Cohodes; the Bank's retention of additional collateral for the Holiday loan without informing the SBA of this fact; and the Bank's failure to provide ninety percent of the additional collateral to the SBA on default. Furthermore, any one or more of the Bank's actions may well have resulted in failure to satisfy a condition precedent to the enforcement of the Guaranty Agreement. We express no opinion on these questions and leave these matters, as well as the issue of whether excessive payments of previous indebtedness constitute a material breach of the Guaranty Agreement, to resolution following a trial on the merits of the contractual claim alleged in Count One of the complaint.

## V. UNJUST ENRICHMENT CLAIM

■ The trial court entered summary judgment against the United States on Count Two of the complaint, which alleged a quasi-contract claim based on the bank's unjust enrichment resulting from fraud. Summary judgment was entered on behalf of the Bank since the cause of action was barred under the three-year statute of limitations for tort violations established in 28 U.S.C. § 2415(b).[6] The government con-

---

6. This section is set forth in footnote 4, *supra.*

tends that the district court's judgment must be reversed since the government had alleged a "quasi-contract" theory subject to the six year limitations period set forth in 28 U.S.C. § 2415(a).[7]

In *Federal Deposit Insurance Corporation v. Bank One, Waukesha*, 881 F.2d 390, 391–93 (7th Cir.1989), we considered the statute of limitations applicable to quasi-contract claims brought on behalf of federal governmental agencies. We noted that there was a great deal of logical support for the position that a "quasi-contract" or "unjust enrichment" recovery should be governed by the three year statute of limitations applicable to the tort of fraud:

'Quasi-contract' allows the victim to follow the proceeds of the fraud, collecting them from the pocket in which they land, but does not change the gravamen of the wrong—here, fraud. No tort, no unjust enrichment. Because the FDIC could not have sued Nanz or Lowry more than three years after learning of their misdeeds, and because recovering 'unjust enrichment' is simply a way to recoup the losses caused by the tort, it seems strange to think that a different caption on the pleadings, a demand against a person farther removed from the wrong, means a longer period of limitations. Unjust enrichment is a remedy in search of a wrong; as a remedy its period of limitations might logically be assimilated to that for the wrong.

*Bank One*, 881 F.2d at 392. Nonetheless, we concluded that it was necessary to apply the contract statute of limitations found in 28 U.S.C. § 2415(a) to a "quasi-contract" cause of action:

On first principles, then, the period of limitations for unjust enrichment actions should track that of the wrong. Two district judges have reached this conclusion for purposes of § 2415(b). *Blusal Meats, Inc. v. United States*, 638 F.Supp. 824 (S.D.N.Y.1986); *United States v. Vicon Construction Co.*, 575 F.Supp. 1578

(S.D.N.Y.1983). Unfortunately, however, first principles are the only support for this conclusion. For hundreds of years, courts in England and the United States have been doing things otherwise, and this conclusion is too well established to be overthrown.

... [W]hen Congress enacted § 2415 in 1966, providing that suits 'founded upon any contract express *or implied in law or fact*' could be brought within six years, such a provision had a definite meaning in common law jurisdictions. The statute was designed to put the United States as plaintiff on the same footing as private litigants.... Because private litigants have been able to use the period of limitations for contracts ever since 'unjust enrichment' landed in the 'contract' cubbyhole in the seventeenth century, our contrary assessment does not justify a different result.

The two courts of appeals that have examined the question before reached the conclusion that the United States may choose the six-year period in unjust enrichment cases. *See United States v. P/B STCO 213*, 756 F.2d 364, 374–76 (5th Cir.1985); *United States v. Neidorf*, 522 F.2d 916 (9th Cir.1975); *United States v. Limbs*, 524 F.2d 799 (9th Cir.1975); *United States v. Dae Rim Fishery Co.*, 794 F.2d 1392 (9th Cir.1986). *See also United States v. State Farm Insurance Co.*, 599 F.Supp. 441 (E.D.Mich.1984). *Blusal* and *Vicon*, the only cases going the other way under § 2415, displayed no awareness of the history of this problem—or of the appellate decisions on the subject, for that matter. The FDIC unequivocally chose quasi-contract as a basis *of its claim, jettisoning any hope for* punitive damages. Its choice must be respected.

*Bank One*, 881 F.2d at 392–93 (citations omitted) (emphasis in original). Thus, *Bank One* calls for the application of the

---

**7.** 28 U.S.C. § 2415(a) provides, in pertinent part:
"**(a)** Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues...."

six-year limitation period of 28 U.S.C. § 2415(a) to the "quasi-contract" claim alleged in Count Two of the complaint.

The Bank argues that *Bank One* is distinguishable because the FDIC chose quasi-contract as a basis for its claim [8] while in this case the government was primarily relying upon a fraud theory. We disagree. In both *Bank One* and in the second count of the government's complaint herein, the government made a "quasi-contract" or "unjust enrichment" claim based upon allegations of fraud. Indeed, the government's complaint filed in this case specifically alleges that the SBA's payment of the guaranty to the Bank "under mistake, without legal authority nor legal obligation has resulted in the Bank being unjustly enriched," the essence of a "quasi-contract" claim. Furthermore, as in *Bank One*, Count Two of this complaint merely seeks restitution of the amount of the benefit conferred on the bank. *See Bank One*, 881 F.2d at 391, 393. Thus, *Bank One* controls this case and requires application of the six-year limitations period contained in 28 U.S.C. § 2415(a).

▮ The Bank further asserts that summary judgment was properly entered on statute of limitations grounds even if the six-year limitations period was applicable. The Bank alleges that the limitations period began to run April 7, 1981, when SBA employees learned from the FBI of misstatements in the Holiday Loan Guaranty Application. The Bank ignores that fact that, in its cause of action in Count Two of the complaint, the government is seeking reimbursement for mistaken payment of the guaranty. Under the terms of the Guaranty Agreement, a written demand served upon the SBA was necessary to require the SBA to purchase the loan pursuant to the Guaranty Agreement which obligated the SBA to purchase the outstanding balance of the loan if default by the borrower continued for more than 60 days.[9] Prior to April 17, 1981, the date that the SBA received the Bank's demand to pay the loan guaranty, the SBA had no obligation to pay the guaranty and had suffered no monetary loss. Therefore, its cause of action to recover for the loss had not accrued. *Cf. United States v. Vanornum*, 912 F.2d 1023, 1027 (8th Cir.1990) ("Because Herman had no obligation to pay under the guarantees until Eat Inc. defaulted *and* a written demand for payment was made, we hold the statute of limitations on the SBA's action to collect under the guarantees began to run only after Herman had received SBA's demand.") (SBA suit to collect on personal guaranty to SBA) (footnote omitted, emphasis in original). Because the government's cause of action accrued no earlier than April 17, 1981, the date of the Bank's letter demanding payment of the loan guaranty, a date less than six years before the government's April 14, 1987 filing of its complaint, the "quasi-contract" count of the complaint was timely filed under 28 U.S.C. § 2415(a). Thus, we remand this count for trial on its merits.[10]

## VI. FALSE CLAIMS ACT

▮ The trial court entered summary judgment against the United States on the False Claims Act cause of action because the government failed to demonstrate a

---

**8.** *Bank One*, 881 F.2d at 393.

**9.** Section 7 of the Guaranty Agreement provides, in pertinent part, that:
Lender may demand in writing that SBA purchase the guaranteed percentage of the outstanding balance of the loan if default by a borrower continues uncured for more than 60 days (or less if SBA agrees) in making payment, when due, of any installment of principal or interest on any note.

**10.** The district court also stated that:
To the extent that Count II seeks damages for breach of the agreement between [the SBA] and the Bank, the Bank would prevail on summary judgment because the alleged breaches of this agreement, whether misrepresentations or other breaches, would not be material, for the reasons set out in [the Materiality of the Bank's Breach of the Agreement section] of this opinion.
*Cicero*, 736 F.Supp. at 902. Our reversal of the trial court's grant of summary judgment in favor of the Bank on the material breach issue, renders improper its reliance on its reasoning on this issue as an additional ground to support its dismissal of the quasi-contract count of the complaint.

"relationship between the defendant's false statement and [the government's] damages" as required under the Third Circuit's decision in *United States v. Hibbs*, 568 F.2d 347 (3d Cir.1977).[11] *First National Bank*, 736 F.Supp. at 903. The district court explained:

> The Bank's claim for payment was 'false' because the Bank represented that it had properly disbursed the funds when in reality it had improperly applied $86,000 to retire prior debt. The SBA's loss was unrelated to the Bank's false statements; it was caused by the fire, to the dealership and by Holiday's subsequent default.

*Id.* at 902–03.

The government argues that the *Hibbs* requirement of a "causal" relationship between the false statement and damages is inconsistent with the language and the underlying policy of False Claims Act.

In *Hibbs*, "a real estate broker ... submitted certifications to the Federal Housing Administration misrepresenting the condition of certain residential properties. That agency then insured mortgages on the homes and was later required to pay the mortgages when defaults occurred." *Hibbs*, 568 F.2d at 349. While the district court in *Hibbs* found that "the defaults were caused either by the mortgagors' changed financial circumstances or irresponsibility, and that there was no causal connection between the false certifications and the default," it, nonetheless, concluded that the government had established a basis for recovery under the False Claims Act. *Id.* The Third Circuit reversed the trial court because it concluded that the

False Claims Act required "a causal connection between loss and fraudulent conduct. ..." *Id.* The Third Circuit did not merely require that the false statement be the "but for" cause of the government's damage, in the sense that the government would not have provided mortgage insurance or a loan guaranty if it had been aware of the statement's falsity. It also read the False Claims Act to require that the subject matter of the false statement (in *Hibbs*, the misstatements concerning condition of property; in the instant case, the excessive loan repayments to the Bank) be the source of the government's loss. *See Hibbs*, 568 F.2d at 349, 351. As the Third Circuit noted:

> The government's position is that had Hibbs not furnished the false certification, it would not have insured the mortgage and therefore would not have been called upon to make any payment ...
>
> We are unable to accept this argument because it ignores the statute's restrictive language 'by reason of.' The damages were sustained by the United States because defaults by the mortgagors and to some extent were increased by the unexpected diminution of property value caused by the lead paint injunction. Neither of those events was caused by or related to the false certifications. Indeed, precisely the same loss would have been suffered by the government had the certifications been accurate and truthful. To further illustrate the extreme to which the government's argument would lead—if the mortgagors had defaulted because their houses had been destroyed by a flood or some other uninsured catas-

---

**11.** When *Hibbs* was decided, the False Claims Act awarded compensation to the United States for damages it "sustained by reason of the doing or committing" of the acts prohibited by the statute. A 1982 amendment to the statute replaced the words "by reason of the doing or committing" with the word "because". The Explanatory Notes accompanying the revised statute stated that the original wording was "omitted as surplus" and did not mention the addition of the word "because". Other courts which have considered the question of the False Claim Act's causation requirement have concluded that Congress did not intend to alter the Act's meaning when it made this specific change, but

rather attempted to convey the same idea in fewer words. *See Cicero*, 736 F.Supp. at 903 and *United States v. Hill*, 676 F.Supp. 1158, 1180 (N.D.Fla.1987). We agree, and therefore will assume that the Act's meaning as to the causation requirement was unchanged by the 1982 amendment. This conclusion is buttressed by the Statement of Purpose provided in the House Report on the 1982 amendment. It states that "[t]he purpose of the bill is to restate in comprehensive form, *without substantive change*, certain general and permanent laws ... and to enact these laws as title 31, United States Code." House Report No. 97–651, 1982 U.S.C.A.A.N., p. 1895 (emphasis added).

trophe, the government's theory would nevertheless hold Hibbs liable because he failed to call its attention to defects in the plumbing. We cannot conceive that Congress intended such an inequitable result.

The statutory limitation, 'by reason of' the commission of the unlawful act, compels consideration of the element of causation. That requirement should be liberally construed so as to provide the government restitution from those whose fraud has caused loss. It should not, however, be disregarded completely so as to eliminate the relationship between the unlawful act and the injury ultimately sustained.

*Id.* at 351.

A dissenting opinion in *Hibbs* acknowledged that "the defaults by the mortgagors on the six properties were not caused by nor were they in any way related to the conditions that were the subject of Hibbs' false certifications," but also noted that "[t]he FHA relied on these statements in issuing its mortgage insurance and had the statements not been false, FHA insurance would not have been issued regarding the six mortgages in question." *Hibbs*, 568 F.2d at 353 (Meanor, J., dissenting). The dissent rejected the *Hibbs* majority's requirement of a relationship between the damages and the subject matter of the false claim, stating:

> The False Claims Act awards double damages sustained by the United States by reason of the false claim. It does not award damages occasioned by the cause of the falsity of the claim.

*Id.* at 353–54.

In our view the *Hibbs* majority sets forth a somewhat unduly restrictive causation requirement for a False Claims Act recovery. If the government would not have made a financial commitment absent the claimant's false statement, and the government is nevertheless required to pay a mortgage insurance claim or a loan guaranty, the government has suffered damage "because of" the false statement, as required by the Act. We disagree with the statement in *Hibbs* that "the same loss would have been suffered by the government had the certifications been accurate and truthful." [12] Thus, we disagree with the Third Circuit's reasoning and hold that a demonstration that the government would not have guaranteed the loan "but for" the false statement is sufficient to establish the causal relationship between the false claim and the government's damages necessary to permit recovery under the False Claims Act. We reverse the district court's entry of summary judgment on the False Claims Act count and remand for trial.

## VII. CONCLUSION

Because we hold that the district court improperly entered summary judgment in favor of the Bank on each of the three counts of the Government's complaint, we order the case remanded to the district court for trial on the merits.

REVERSED AND REMANDED.

---

**12.** *Hibbs*, 568 F.2d at 351.

> As noted in *Hill*, 676 F.Supp. at 1181 n. 27: [T]he Third Circuit's conclusion—*i.e.*, that the Government would have suffered the same loss had the false certifications been truthful—raises a serious question about its basis. The district court found that the FHA 'would not have undertaken to insure the mortgages against default had it not been for the submission of the false certifications.' *United States v. Hibbs, supra*, 420 F.Supp. [1365] at 1367 [E.D.Pa.1976]. The Third Circuit did not hold

> that this factual finding was clearly erroneous. In light of this fact, it is difficult to see how the Government's damages would have been the same irrespective of the veracity of the certifications. If they were accurate, that is, if they correctly stated that the plumbing, electrical and heating systems were not in compliance with FHA standards, the FHA would have refused to guarantee the mortgages and would not have lost any money.
> *Cf. United States v. Rapoport*, 514 F.Supp. 519 (S.D.N.Y.1981).